[No. S155872. Aug. 21, 2008.]

In re RICHARD SHAPUTIS on Habeas Corpus.

1242

COUNSEL

Law Offices of Marc Elliot Grossman, Marc Elliot Grossman; and Monica Knox, Assistant Federal Defender, for Petitioner Richard Shaputis.

Edmund G. Brown, Jr., Attorney General, Dane R. Gillette, Chief Assistant Attorney General, Julie L. Garland, Assistant Attorney General, Anya M. Binsacca, Heather Bushman and Amanda Lloyd, Deputy Attorneys General, for Respondent State of California.

John R. Poyner, District Attorney (Colusa); Bonnie M. Dumanis, District Attorney (San Diego); Albert C. Locher, Assistant District Attorney (Sacramento); Richard J. Sachs, Deputy District Attorney (San Diego); and W. Scott Thorpe for California District Attorneys Association as Amicus Curiae on behalf of Respondent State of California.

OPINION

**GEORGE, C. J.**—In 1987, Richard Shaputis (petitioner) was convicted of the second degree murder of his wife, Erma, and was sentenced to an indeterminate term of imprisonment of 15 years to life in prison, and an additional two years because of his use of a firearm in the commission of the offense. In 2006, after several unfavorable parole hearings before the Board of Parole Hearings (Board)[1] and rulings by the superior court and the Court of Appeal, the Board, in compliance with the mandate of an earlier judicial decision, reluctantly found petitioner suitable for parole and set a parole date. The Governor, however, reversed the Board's decision, concluding petitioner constituted a threat to public safety.

In a petition for writ of habeas corpus, petitioner challenged on several grounds the Governor's decision denying parole. The superior court denied the petition. The Court of Appeal, in a split decision, reversed the superior court and granted the writ, concluding that neither the circumstances of petitioner's crime, nor petitioner's "method of coping with his guilt," provided evidence supporting the conclusion that petitioner currently would pose an unreasonable risk to public safety.

We granted review to consider the Attorney General's contention that the Court of Appeal majority improperly applied the deferential "some

---

[1] The Board of Parole Hearings replaced the Board of Prison Terms in July 2005. (Pen. Code, § 5075, subd. (a).) For ease of reference, and because both entities have performed the same duties, we refer to both as "the Board."

evidence" standard of review. We conclude that the appellate court erred in reversing the Governor's decision. Applying the "some evidence" standard of review as clarified in the companion case, *In re Lawrence* (2008) 44 Cal.4th 1181, 1190–1191 [82 Cal.Rptr.3d 169, 190 P.3d 535] (*Lawrence*), we conclude that some evidence in the record supports the Governor's conclusion that petitioner remains a threat to public safety in that he has failed to take responsibility for the murder of his wife, and despite years of rehabilitative programming and participation in substance abuse programs, has failed to gain insight into his previous violent behavior, including the brutal domestic violence inflicted upon his wife and children for many years preceding the commitment offense. By statute, it is established that the gravity of the commitment offense and petitioner's current attitude toward the crime constitute factors indicating unsuitability for parole, and because in this case these factors provide evidence of the risk *currently* posed by petitioner to the community, they provide "some evidence" that petitioner constitutes a current threat to public safety. Accordingly, we reverse the judgment rendered by the Court of Appeal.

## I

The facts underlying the commitment offense and the history of petitioner's parole hearings are not in dispute.

## A

Petitioner's mother deserted her husband and children when petitioner was nine years of age. Petitioner's father worked long hours and frequently was absent from the home, leaving petitioner to raise himself and his six younger siblings. Petitioner's probation report and 1997 life prisoner evaluation report (LPER) reflect that petitioner stated his father physically abused him. During his 2004 mental health evaluation and at his parole consideration hearing held that year, petitioner denied that any abuse took place.

Petitioner has been married three times. His first marriage lasted nine years, and before ending in divorce the union produced four daughters, one of whom, Annette, remained in her father's custody after the dissolution of the marriage. She recounted that petitioner severely abused her mother, herself, and her sisters. Annette recounted that petitioner once jumped on her mother's stomach, causing her mother to miscarry. If petitioner felt Annette or her sisters had misbehaved, he would hold a knife to their throats. Annette also explained that petitioner was a different person behind closed doors than he was in the presence of other persons, and that he singled out one daughter in particular for abuse because she was the weakest emotionally. Annette reported that her mother divorced petitioner because of this physical abuse.

Petitioner subsequently married his second wife, the victim, Erma,[2] and although this marriage lasted 23 years, it too was beset by violence.[3] Petitioner's probation report reflects that Annette told the authorities that before moving out of petitioner's home in 1978, she saw petitioner beat Erma on several occasions and observed large bruises on Erma's body. The 1987 probation officer's report also states that 15 years prior to the murder, petitioner beat Erma so "terribly" that she needed plastic surgery. Two years prior to the murder, Erma complained to petitioner's daughter Sheryl[4] that petitioner had beaten her and cracked her ribs. Linda Nguyen, a friend of Erma's, stated that between 1981 and 1986, she observed bruises on Erma every four to six months, and that Erma told her that petitioner flew into rages and beat her. Petitioner's daughter Terry stated that petitioner had threatened Erma with a knife. During petitioner's trial, Erma's parents testified that petitioner had threatened to send Erma "home in a box." Approximately 18 months prior to the murder, when they had been drinking and arguing, petitioner discharged a firearm at Erma.[5] In the probation report, petitioner is quoted as stating that when Erma slapped him, he "slapped her back." This information was discussed in detail at both petitioner's 2004 and 2006 parole consideration hearings. None of these incidents resulted in criminal charges.

Petitioner's employment history showed greater stability. He worked for San Diego Gas & Electric as an electrician and fabricator for seven years, owned his own welding business, and worked for Bechtel Corporation as a supervisor for the 13 years preceding the murder.

On the night of the murder, petitioner telephoned 911 at approximately 10:00 p.m., stated he had fought with his wife and killed her, but claimed it was an accident. When the police arrived at petitioner's home, he surrendered without incident. Petitioner, a problem drinker with a history of violence when drunk, was drinking heavily the night of the murder. His blood-alcohol level was between .14 and .24 percent at the time of the shooting. Nevertheless, petitioner appeared completely aware of his surroundings. When the police entered his house, they found Erma's body in the living room with a

---

[2] In some parts of the record, the victim's name is spelled "Irma."

[3] While incarcerated, petitioner married his third wife, a recovering alcoholic.

[4] "Sheryl" is spelled "Cheryl" in the transcripts of the parole hearings, but "Sheryl" in the 1987 probation report and other documents in the record.

[5] According to the 1987 report of petitioner's parole officer, which cites the district attorney's file, petitioner's daughter Sheryl stated that petitioner told her about the earlier shooting incident. This incident was recited in petitioner's 2004 mental health evaluation and at his 2006 parole consideration hearing. According to the 2004 mental health evaluation, during a psychiatric evaluation in 1994 petitioner admitted this shooting. Nevertheless, at his 2006 parole consideration hearing, petitioner denied shooting at the victim before the murder.

handgun lying nearby. The arrest report relates that an open box of ammunition was present on a table near the body. The report also states that the gun could not have been fired accidentally, because the hammer was required to be pulled back into a cocked position to enable the trigger to function, and the gun had a "transfer bar" preventing accidental discharge. The coroner's report concluded Erma was killed sometime after 8:30 p.m. by a gunshot wound to the neck. The autopsy examiner concluded that the shot, which entered the neck between the junction of the neck and the jaw, had been fired from close range.[6]

Although the commitment offense was petitioner's first felony conviction, his record reflects a long and sometimes violent criminal history. Petitioner was arrested in 1966 for check fraud or writing checks on a closed account in violation of Penal Code section 476; this charge was dismissed. In 1975, petitioner was charged with and convicted of failing to make child support payments, in violation of Penal Code section 270, and was placed on three years' formal probation. In 1978, petitioner was arrested for pandering, convicted of an unspecified offense, and sentenced to "30 days work furlough." Also in 1978, petitioner was charged with raping his 16-year-old daughter, who reported that petitioner raped her twice while he was intoxicated.[7] Although petitioner was charged under Penal Code former section 261.3 and section 285 with rape by threat and with incest, the charges were reduced to a misdemeanor of soliciting or engaging in a lewd act. He pleaded no contest and was placed on three years' formal probation. This conviction was expunged in 1982. In 1979, petitioner failed to register as a sex offender as required by his 1978 conviction. Petitioner also admitted having once been arrested and fined for driving a motor vehicle while under the influence of alcohol (DUI) when he was 25 years of age, although his 2005 mental health evaluation update states that there is "a history of several arrests for DUI."[8]

As reflected in the background discussed above, petitioner has a substantial problem with alcohol. He began consuming alcoholic beverages when he was 18 years of age and describes himself as an alcoholic. Nevertheless, he considers himself to be a "mellow . . . outgoing" drinker.

---

[6] The 2004 LPER states that the "[e]xaminer surmised that the shot would have been fired at a close range anywhere from 1 inch to 3 feet, most likely from less than 12 to 16 inches." The 2004 mental health evaluation and the 2005 mental health evaluation update state that the shot was fired from a distance of one foot.

[7] According to the 2005 mental health evaluation update, petitioner denied the allegation, claiming he had wandered into his daughter's room by mistake. This report and the 2004 mental health evaluation, however, state that petitioner admitted in 2001 that he had touched his daughter inappropriately but denied that intercourse occurred.

[8] At petitioner's 2006 parole consideration hearing, his attorney stated that petitioner had only one prior conviction for DUI.

As reflected in the transcript of his 2006 parole consideration hearing, petitioner has had difficulty forming enduring bonds with his family. Petitioner has no contact with his siblings, his four daughters, or his first wife. He has difficulty discussing his daughters' allegations of rape, incest, and domestic violence, finding the accusations "inexplicable," and appears resigned to having no contact with his daughters. Petitioner acknowledges that his relationship with his daughters is strained, and that they do not communicate with him. This situation does not bother him, however, because "we all have to go our own way."

## B

Petitioner has remained discipline free throughout his incarceration. He has a long and positive work record, has fully participated in all available Alcoholics Anonymous (AA) and Narcotics Anonymous programs since 1991, and has completed all applicable therapy programs, including Hands of Peace, Alternatives to Violence, Breaking Barriers, Morals and Values, and Controlling Anger and Learning to Manage It, a program that focuses upon domestic violence. For several years, petitioner has had the lowest classification score possible for a life-term inmate, and has received numerous commendations from prison staff for his work, conduct, and reform efforts. Petitioner is 71 years of age, has had three heart attacks, and suffers from other chronic health problems.

Petitioner's minimum eligible parole date was in September 1998. At his first parole hearing, in 1997, the LPER prepared by his prison counselor for submission to the Board stated petitioner's "progress in state prison could best be described as exemplary," and concluded he "would probably pose a low degree of threat to the public at this time, if released from prison." Addressing the commitment offense, petitioner asserted that the shooting was an accident; there was no fight before the shooting; the victim handed him the gun for his own protection; he did not know the gun was loaded, and he did not aim at the victim.[9]

The Board found petitioner unsuitable for parole and recommended he remain discipline free and participate in self-help and therapy groups. At petitioner's second parole hearing in 2002, the LPER confirmed he had remained discipline free and continued to participate in self-help groups, and again concluded (based upon his commitment offense, his prior record, and his prison adjustment) that he "would probably pose a low degree of threat to the public at this time if released from prison." The Board again found

---

[9] At trial, Erma's parents testified she was afraid of guns and would have nothing to do with firearms.

petitioner unsuitable for parole, and again recommended he remain discipline free and participate in self-help and therapy groups.

The psychological report prepared in conjunction with petitioner's 2004 parole suitability hearing stated that petitioner had feasible and appropriate plans for his life if granted parole, and appeared very committed to maintaining his sobriety through continued involvement with AA. The report also stated, however, that the "atypical, detached, almost schizoid quality to some of petitioner's earlier relationships" was suggestive of early trauma that petitioner chooses not to discuss. The report further noted that petitioner has a reduced ability to achieve self-awareness and to develop relationships with others. The report assessed petitioner's risk for violence if paroled, concluding he presented a low risk for violence absent a relapse into alcoholism.[10] The LPER prepared by petitioner's prison counselor for the 2004 parole suitability hearing again noted petitioner's exemplary prison record and that he had fully adhered to the Board's prior recommendations. The report concluded, considering the commitment offense, petitioner's prior criminal record, and his adjustment in prison, that he "probably [would] pose a low degree of threat to the public at this time if released from prison."[11] With regard to petitioner's contention that the murder of his wife was an accident, he was afforded the opportunity to amend his statements at the 1997 hearing, but he asked that his characterization of the crime remain unchanged—that is, he continued to contend that the murder was an accident.

The Board concluded petitioner was not suitable for parole, because he posed "an unreasonable risk of danger to society or a threat to the public safety if released from prison." The Board cited two findings supporting this conclusion. First, the Board found the commitment offense was "carried out in an especially cruel and/or callous manner" and was "carried out in a dispassionate and/or calculated manner," because the murder was committed

---

[10] The report's risk-of-violence assessment evaluated three elements: petitioner's history and background, his clinical presentation, and his "management of future risk." The report found that petitioner's ability to handle future stress in a nonviolent manner is dependent upon his ability to remain sober, to engage in activities that hold his interest, and to participate in an active relapse prevention program. The report also concluded, however, that petitioner would present an unpredictable risk for future domestic violence if he relapsed into alcohol abuse. If he did not relapse, his potential for violence would be "quite close" to the average unconfined citizen. The report concluded that petitioner's ability to handle future stress in a nonviolent manner was largely rooted in his ability to remain sober. The examining psychiatrist believed petitioner's prison record (that is, his commitment to his AA program and his demonstrated ability to comply with rules) and his current physical condition (a senior citizen with chronic health problems that would limit concerns about his acting out in inappropriate ways) made petitioner a low risk for future violence.

[11] The two prior LPER's, prepared by petitioner's prison counselors for submission to the Board in connection with his 1997 and 2002 parole hearings, also expressed the opinion that petitioner posed a low degree of threat to the public if released from prison.

at close range with a single shot. Second, the Board found petitioner had a "history of unstable and tremulous [*sic*] relationships with others and had assaulted his wife."

## C

Petitioner filed a petition for a writ of habeas corpus in the San Diego County Superior Court alleging the Board had violated his due process rights because its unsuitability determination was unsupported by the evidence and hence was arbitrary and capricious. The court denied the writ, concluding the Board's decision was supported by some evidence. Petitioner then filed a petition for a writ of habeas corpus in the Court of Appeal. The appellate court, in a split decision, concluded the Board's decision to deny parole violated his right to due process, because the Board's finding that petitioner posed an unreasonable danger if released was contrary to the only reliable evidence concerning his current dangerousness, and the Board's decision relied upon findings unsupported by any evidence. The dissenting justice maintained that there existed more than "some evidence" that the crime was aggravated, and that petitioner had yet to understand why he was an alcoholic, why he engaged in serious domestic violence, and why he murdered his wife—all of which constituted "some evidence" that petitioner remained a threat to public safety.

The Court of Appeal ordered the Board to vacate its denial of parole and to conduct a new parole suitability hearing for petitioner. The court instructed the Board that it was barred from finding petitioner unsuitable for parole based upon the same findings articulated at its 2004 hearing, absent new or different evidence. The court explained that the Board could consider petitioner's suitability de novo insofar as new or different evidence was presented at the hearing.

The Board conducted the ordered parole hearing in March 2006. The only information not previously available to the Board was the psychological assessment, conducted in April 2005 by Dr. Silverstein, which concluded petitioner "would appear to be a low risk of future violence if release[d], as long as he maintains sobriety and involvement in an active relapse prevention program." The assessment also confirmed, however, that petitioner had a "schizoid quality to interpersonal relationships," and noted that petitioner seemed to have "limited . . . insight" regarding his antisocial behavior and the circumstance that his history of alcohol abuse was closely associated with his history of domestic violence. The report stated, nevertheless, that "there appears little potential benefit at this point in his development to attempt to modify this [character-based] structure."

The report concluded that if petitioner remained sober, his risk of violence was close to that of the "average unconfined citizen," but if he relapsed "the risk would likely rise considerably and he would present . . . an unpredictable risk for future domestic violence." Dr. Silverstein was concerned that petitioner planned to reside with his new wife (with whom he had not previously resided) and observed that his violence tended to be "confined to his family systems and [it is] difficult to assess how well extinguished his pattern of domestic violence is[,] given that he has been confined for more than 18 years. If he abstains from alcohol, the risk is probably low." Dr. Silverstein also noted that the amount of support petitioner would receive from his third wife (a recovering alcoholic) in maintaining his sobriety "may need some external verification." Dr. Silverstein concluded that alcohol relapse prevention and domestic violence treatment programming would "likely adequately manage these risks," and recommended that petitioner's conditions of parole include random alcohol testing and mandatory participation in a relapse prevention program and community-based domestic violence program. The report further concluded petitioner's alcohol dependence is in "sustained institutional remission."

During the proceedings, the Board referred to Dr. Silverstein's report, noting the report's observation that petitioner found "inexplicable" his daughters' prior allegations of molestation and domestic violence, that he had a flat affect when discussing these allegations, and that this circumstance could be a sign of the schizoid tendencies noted in some previous evaluations. The Board expressed concerns regarding petitioner's lack of insight into his history of domestic violence and his alcoholism, and voiced the attendant concern that he would present an unreasonable risk of danger to the public and to his new wife. When questioned whether he had a problem in the way he treated women, petitioner replied, "[w]ell, no I don't. I don't know how to say that I don't have a problem now. I didn't have a—I guess I had a problem then but I don't know how to put it into pictures or words. I just—It was one of those things I didn't quite understand, I guess. Not having a thorough idea of how stupid I was being, how dumb I was being." The deputy district attorney asked the panel to question petitioner further concerning his current understanding of why he committed the murder and why he now would not commit such a crime. The presiding commissioner on the panel explained that the question was important in determining how petitioner was "different today." Petitioner's counsel advised him not to answer the question.

The Board, considering itself severely restricted in the exercise of its discretion by the appellate court's instructions on remand, reluctantly found petitioner suitable for parole. The presiding commissioner stated that she believed petitioner was still unsuitable for parole, as he was in 2004, because he continued to lack understanding concerning why he killed his wife and why for years he engaged in domestic violence. The Board concluded,

however, that the Court of Appeal's opinion barred the Board from finding petitioner unsuitable on the same grounds relied upon at the previous hearing, and that the appellate opinion also barred reliance on the evidence previously considered. Expressly stating that this limiting directive guided its conclusion, the Board found petitioner suitable for parole.

The Board, employing a matrix applicable to second degree murderers (Cal. Code Regs., tit. 15, § 2402, subd. (b)),[12] set petitioner's maximum term (after deducting credits) at 151 months. Because this term lapsed in November 1999, the Board granted petitioner parole subject to the special parole conditions that petitioner submit to alcohol testing and participate in a substance abuse program and a domestic violence program. It ordered petitioner paroled to San Diego County.

In August 2006, Governor Arnold Schwarzenegger reversed the Board's decision, because he concluded petitioner posed an unreasonable risk of danger to society if released. The Governor's decision relied upon two grounds: (1) the crime was especially aggravated because it involved some premeditation, and (2) petitioner had not fully accepted responsibility for, and lacked sufficient insight concerning, his conduct toward the victim. In discussing these two reasons, the Governor related the circumstances of petitioner's offense, pointing out that petitioner previously had considered killing his wife and sending her "home in a box." The Governor also considered petitioner's long history of domestic violence, including a beating so severe that Erma needed plastic surgery. The Governor further noted petitioner's criminal history, his poor relationship with his family, and his new marriage.

As he had done following the prior denial of parole by the Board, petitioner again filed in the San Diego County Superior Court a petition for a writ of habeas corpus, this time alleging the Governor's decision violated his right to due process of law because the unsuitability determination was unsupported by the evidence and was therefore arbitrary and capricious. After the court denied the writ, petitioner again filed a petition for a writ of habeas corpus in the Fourth District Court of Appeal.

The appellate court, in another split decision, granted petitioner relief, concluding that (1) "the circumstances of the crime do not provide any evidence to support the conclusion that petitioner would currently pose an unreasonable risk to public safety if released on parole," and (2) "there is no evidence to support the conclusion that petitioner posed an unreasonable risk

---

[12] Unless otherwise indicated, all further unspecified statutory references are to the Penal Code, and all further undesignated references to regulations are to title 15 of the California Code of Regulations.

of danger merely because of his method of coping with his guilt." The dissenting justice noted that the Board had paroled petitioner reluctantly, doing so despite its conclusion that if released petitioner still presents an unreasonable risk of danger to public safety.

## II

■ We granted review to resolve a conflict among the Courts of Appeal regarding the proper scope of the deferential "some evidence" standard of review set forth in *In re Rosenkrantz* (2002) 29 Cal.4th 616 [128 Cal.Rptr.2d 104, 59 P.3d 174] (*Rosenkrantz*), and thereafter applied in *In re Dannenberg* (2005) 34 Cal.4th 1061 [23 Cal.Rptr.3d 417, 104 P.3d 783] (*Dannenberg*). Specifically, we must decide whether a reviewing court focuses upon "some evidence" of the core statutory determination that petitioner remains a current threat to public safety, or merely "some evidence" that supports the Governor's characterization of facts in the record. In the companion case of *Lawrence*, filed concurrently with this opinion, we conclude that, because the paramount consideration for both the Board and the Governor under the governing statutes is whether the inmate currently poses a threat to public safety, and because the inmate's due process interest in parole mandates a meaningful review of a denial-of-parole decision, the proper articulation of the standard of review is whether there exists "some evidence" that an inmate poses a current threat to public safety, rather than merely some evidence of the existence of a statutory unsuitability factor. (*Lawrence, supra,* 44 Cal.4th at p. 1191.)

With regard to the Board's or the Governor's reliance upon the circumstances of the crime as evidence that an inmate remains a current threat to public safety, we conclude in *Lawrence* that because the aggravated nature of a commitment offense does not, in every case, provide relevant evidence that an inmate remains dangerous, and a focus upon the egregiousness of the commitment offense to the exclusion of other relevant evidence has proved in practice to obscure the core statutory emphasis upon *current* dangerousness, the manner in which courts apply the some evidence standard in evaluating the evidentiary value of the gravity of the commitment offense requires some clarification. (*Lawrence, supra,* 44 Cal.4th at p. 1213.)

■ Accordingly, "the determination whether an inmate poses a current danger is not dependent upon whether his or her commitment offense is more or less egregious than other, similar crimes. (*Dannenberg, supra,* 34 Cal.4th at pp. 1083–1084, 1095.) Nor is it dependent solely upon whether the circumstances of the offense exhibit viciousness above the minimum elements required for conviction of that offense. Rather, the relevant inquiry is whether the circumstances of the commitment offense, when considered in light of

other facts in the record, are such that they continue to be predictive of current dangerousness many years after commission of the offense. This inquiry is, by necessity and by statutory mandate, an individualized one, and cannot be undertaken simply by examining the circumstances of the crime in isolation, without consideration of the passage of time or the attendant changes in the inmate's psychological or mental attitude. (*Rosenkrantz, supra,* 29 Cal.4th at p. 682.)" (*Lawrence, supra,* 44 Cal.4th at p. 1221.)

Thus, "the Board or the Governor may base a denial-of-parole decision upon the circumstances of the offense, or upon other immutable facts such as an inmate's criminal history, but some evidence will support such reliance *only* if those facts support the ultimate conclusion that an inmate *continues* to pose an unreasonable risk to public safety. [Citation.] Accordingly, the relevant inquiry for a reviewing court is not merely whether an inmate's crime was especially callous, or shockingly vicious or lethal, but whether the identified facts are *probative* to the central issue of *current* dangerousness when considered in light of the full record before the Board or the Governor." (*Lawrence supra,* 44 Cal.4th at p. 1221.)

In the present case, the Court of Appeal majority properly framed its inquiry as whether "some evidence" supports the Governor's determination that petitioner poses a current threat to public safety. The appellate court also properly recognized that the aggravated circumstances of the commitment offense are relevant only insofar as they continue to demonstrate that an inmate currently is dangerous. As explained below, however, the majority decision failed to adhere to the deferential standard of review we set forth in *Rosenkrantz, supra,* 29 Cal.4th 616, and because a review of the record reveals some evidence supporting the Governor's decision that petitioner remains dangerous, we must conclude that the Court of Appeal majority improperly substituted its own parole suitability determination for that of the Governor.

### III

We review the record to determine whether some evidence supports the Governor's determination that petitioner remains a current threat to public safety pursuant to section 3041 because of the aggravated circumstances of his commitment offense and "his lack of insight into the murder and the abuse of his wife and family." For the reasons set forth below, we conclude that "some evidence" in the record supports the conclusion that petitioner poses an unreasonable public safety risk, and accordingly further conclude that the Court of Appeal erred in setting aside the Governor's decision. (See *Rosenkrantz, supra,* 29 Cal.4th at p. 658; *Dannenberg, supra,* 34 Cal.4th at p. 1071.)

## A

 "The applicable statutes provide that the Board is the administrative agency within the executive branch that generally is authorized to grant parole and set release dates. (§§ 3040, 5075 et seq.) The Board's parole decisions are governed by section 3041 and title 15, section [2402] of the California Code of Regulations. . . . Pursuant to statute, the Board 'shall normally set a parole release date' one year prior to the inmate's minimum eligible parole release date, and shall set the date 'in a manner that will provide uniform terms for offenses of similar gravity and magnitude *in respect to their threat to the public . . . .*' (§ 3041, subd. (a), italics added.) Subdivision (b) of section 3041 provides that a release date must be set 'unless [the Board] determines that the gravity of the current convicted offense or offenses, or the timing and gravity of current or past convicted offense or offenses, is such that consideration of the *public safety* requires a more lengthy period of incarceration for this individual, and that a parole date, therefore, cannot be fixed at this meeting.' (Italics added; see *Rosenkrantz, supra,* 29 Cal.4th at p. 654, fn. omitted.)" (*Lawrence, supra,* 44 Cal.4th at pp. 1201–1202.)

 Title 15, section 2402 of the regulations sets forth the factors to be considered by the Board in carrying out the mandate of the statutes.[13] This regulation is designed to guide the Board's assessment of whether the inmate poses "an unreasonable risk of danger to society if released from prison," and thus whether he or she is suitable for parole. (Regs., § 2402, subd. (a).)[14] The regulation also lists several circumstances relating to *unsuitability* for parole[15]—such as the heinous, atrocious, or cruel nature of the crime, or an unstable social background; and several circumstances

---

[13] Petitioner's parole suitability is governed by title 15, section 2402, which we addressed in *Rosenkrantz, supra,* 29 Cal.4th 616—a discussion excerpted in substantial part below. In the companion case of *Lawrence, supra,* 44 Cal.4th 1181, the inmate's parole suitability is governed by title 15, section 2281, which provides parole consideration criteria and guidelines for murders committed prior to November 8, 1978. The two sections are identical.

[14] These factors include "the circumstances of the prisoner's social history; past and present mental state; past criminal history, including involvement in other criminal misconduct which is reliably documented; the base and other commitment offenses, including behavior before, during and after the crime; past and present attitude toward the crime; any conditions of treatment or control, including the use of special conditions under which the prisoner may safely be released to the community; and any other information which bears on the prisoner's suitability for release. Circumstances which taken alone may not firmly establish unsuitability for parole may contribute to a pattern which results in a finding of unsuitability." (Regs., § 2402, subd. (b).)

[15] Unsuitability factors are: (1) a commitment offense carried out in an "especially heinous, atrocious or cruel manner"; (2) a "[p]revious [r]ecord of [v]iolence"; (3) "a history of unstable or tumultuous relationships with others"; (4) "[s]adistic [s]exual [o]ffenses"; (5) "a lengthy history of severe mental problems related to the offense"; and (6) "[t]he prisoner has engaged

relating to *suitability* for parole—such as an inmate's rehabilitative efforts, demonstration of remorse, and the mitigating circumstances of the crime.[16] (Regs., § 2402, subds. (c), (d).) Finally, the regulation explains that the foregoing circumstances "are set forth as general guidelines; the importance attached to any circumstance or combination of circumstances in a particular case is left to the judgment of the panel." (Regs., § 2402, subds. (c), (d).) The Governor's power to review a decision of the Board is set forth in article V, section 8, subdivision (b) of the California Constitution.[17]

■ "[T]he governing statute provides that the Board *must* grant parole *unless* it determines that *public safety* requires a lengthier period of incarceration for the individual because of the gravity of the offense underlying the conviction. (Pen. Code, § 3041, subd. (b).) And as set forth in the governing

---

in serious misconduct in prison or jail." (Regs., § 2402, subd. (c)(1)–(6).) This subdivision further provides that "the importance attached to any circumstance or combination of circumstances in a particular case is left to the judgment of the panel." (Regs., § 2402, subd. (c).)

Factors supporting a finding that the inmate committed the offense in an especially heinous, atrocious, or cruel manner include the following: (A) multiple victims were attacked, injured, or killed in the same or separate incidents; (B) the offense was carried out in a dispassionate and calculated manner, such as an execution-style murder; (C) the victim was abused, defiled, or mutilated during or after the offense; (D) the offense was carried out in a manner that demonstrates an exceptionally callous disregard for human suffering; and (E) the motive for the crime is inexplicable or very trivial in relation to the offense. (Regs., § 2402, subd. (c)(1).)

[16] Suitability factors are: (1) the absence of a juvenile record; (2) "reasonably stable relationships with others"; (3) signs of remorse; (4) a crime committed "as the result of significant stress in [the prisoner's] life"; (5) battered woman syndrome; (6) the lack of "any significant history of violent crime"; (7) "[t]he prisoner's present age reduces the probability of recidivism"; (8) "[t]he prisoner has made realistic plans for release or has developed marketable skills that can be put to use upon release"; and (9) the inmate's "[i]nstitutional activities indicate an enhanced ability to function within the law upon release." (Regs., § 2402, subd. (d)(1)–(9).)

[17] Article V, section 8 subdivision (b) of the California Constitution provides in full: "No decision of the parole authority of this State with respect to the granting, denial, revocation, or suspension of parole of a person sentenced to an indeterminate term upon conviction of murder shall become effective for a period of 30 days, during which the Governor may review the decision subject to procedures provided by statute. The Governor may only affirm, modify, or reverse the decision of the parole authority on the basis of the same factors which the parole authority is required to consider. The Governor shall report to the Legislature each parole decision affirmed, modified, or reversed, stating the pertinent facts and reasons for the action."

The statutory procedures governing the Governor's review of a parole decision pursuant to article V, section 8 subdivision (b), are set forth in Penal Code section 3041.2, which states: "(a) During the 30 days following the granting, denial, revocation, or suspension by a parole authority of the parole of a person sentenced to an indeterminate prison term based upon a conviction of murder, the Governor, when reviewing the authority's decision pursuant to subdivision (b) of Section 8 of Article V of the Constitution, shall review materials provided by the parole authority. [¶] (b) If the Governor decides to reverse or modify a parole decision of a parole authority pursuant to subdivision (b) of Section 8 of Article V of the Constitution, he or she shall send a written statement to the inmate specifying the reasons for his or her decision."

regulations, the Board must set a parole date for a prisoner unless it finds, in the exercise of its judgment after considering the circumstances enumerated in section 2402 of the regulations, that the prisoner is unsuitable for parole. [Citation.] Accordingly, parole applicants in this state have an expectation that they will be granted parole unless the Board finds, in the exercise of its discretion, that they are unsuitable for parole in light of the circumstances specified by statute and by regulation." (*Rosenkrantz, supra,* 29 Cal.4th at p. 654, italics added.)

■ The Governor is subject to the same standards as those that apply to the Board. As we stated in *Rosenkrantz, supra,* 29 Cal.4th 616, the Governor's interpretation of a documentary record is entitled to deference. (*Id.* at p. 677.) Although "the Governor's decision must be based upon the same factors that restrict the Board in rendering its parole decision" (*Rosenkrantz, supra,* 29 Cal.4th at p. 660), the Governor undertakes an independent, de novo review of the inmate's suitability for parole. (*Ibid.*) Accordingly, the Governor has discretion to be "more stringent or cautious" in determining whether a defendant poses an unreasonable risk to public safety. (*Id.* at p. 686.) When a court reviews the record for some evidence supporting the Governor's conclusion that a petitioner currently poses an unreasonable risk to public safety, it will affirm the Governor's interpretation of the evidence so long as that interpretation is reasonable and reflects due consideration of all relevant statutory factors. (*Rosenkrantz, supra,* 29 Cal.4th at pp. 656–658, 660–661.)

## B

The Governor set forth two general reasons for concluding petitioner currently poses an "unreasonable risk of danger to society" if released from prison: (1) defendant's premeditated intent to kill his wife, which rendered the second degree murder commitment offense "especially aggravated"; and (2) petitioner's lack of insight into the murder and into the years of domestic violence that preceded it.

Specifically, the Governor's decision states the commitment offense is "especially aggravated because it involved some level of premeditation, as evidenced in the record before me . . . . [Petitioner] told the 9-1-1 dispatcher that he and his wife had had a little fight and he had shot her . . . . [W]hen [petitioner] was upset with his wife he would sometimes say he would send her 'home in a box. . . .' [Petitioner] had been violent toward Ms. Shaputis before the murder . . . . [and] had once beaten [Ms. Shaputis] so 'terribly' that she needed plastic surgery on her face, and [petitioner's] daughter reported that Ms. Shaputis had once complained of cracked ribs due to a beating by [petitioner]. . . . [T]he evidence of domestic violence inflicted upon

Ms. Shaputis by [petitioner] 'had high probative value . . . that the defendant had the intent to kill.' The gravity of the second degree murder perpetrated by [petitioner] is alone sufficient for me to conclude presently that his release from prison would pose an unreasonable public-safety risk." The Governor also noted that petitioner continued to assert that he shot his wife accidentally, despite evidence strongly suggesting the shooting was intentional.

The Governor quoted the Board's presiding commissioner, who stated at petitioner's parole hearing that she continued to believe petitioner was unsuitable for parole because, as she explained to him: " 'There still was a lack of understanding as to why, number one, you killed your wife, and number two, why there was so much domestic violence going on in your family through many years. . . . I feel that you did need more time to really think about these things and to come to grips with the crime and show that you know the reasons why you committed the crime. However, today we do feel unduly burdened and bound by this court decision so we're doing what we think is going to be the . . . legal thing to do.' "

The Governor, in his statement reversing the Board, noted petitioner's many years of laudatory work reports, his discipline-free record during incarceration, and his participation in AA, Narcotics Anonymous, and many other rehabilitative programs, including some focused specifically on anger management and domestic violence, and acknowledged petitioner's "creditable gains." The Governor found, however, "the negative factors weighing against [petitioner's] parole unsuitability presently outweigh those tending to support it. Accordingly, because I believe his release from prison would pose an unreasonable risk of danger to society at this time, I REVERSE the Board's 2006 decision to grant parole to [petitioner]."

Some evidence in the record supports the Governor's decision that petitioner remains dangerous. His decision stated that because the commitment offense (second degree murder) was intentional and premeditated, it was "especially aggravated," and "alone sufficient" to conclude that petitioner posed a current risk to public safety. The record supports the Governor's determination that the crime was especially aggravated *and*, importantly, that the aggravated nature of the offense indicates that petitioner poses a current risk to public safety. This is not a case, like *Lawrence, supra*, 44 Cal.4th 1181, 1225, in which the commitment offense was an isolated incident, committed while petitioner was subject to emotional stress that was unusual or unlikely to recur. (See, e.g., Regs., § 2402, subd. (d)(4) [the circumstance that the crime was committed during a period of significant stress in an inmate's life constitutes evidence to be considered in evaluating his or her suitability for parole].) Instead, the murder was the culmination of many years of petitioner's violent and brutalizing behavior toward the victim, his children, and his previous wife.

The record establishes, moreover, that although petitioner has stated that his conduct was "wrong," and he feels some remorse for the crime, he has failed to gain insight or understanding into either his violent conduct or his commission of the commitment offense. Evidence concerning the nature of the weapon, the location of ammunition found at the crime scene, and petitioner's statement that he had a "little fight" with his wife support the view that he killed his wife intentionally, but as the record also demonstrates, petitioner *still* claims the shooting was an *accident*. This claim, considered with evidence of petitioner's history of domestic abuse and recent psychological reports reflecting that his character remains unchanged and that he is unable to gain insight into his antisocial behavior despite years of therapy and rehabilitative "programming,"[18] all provide some evidence in support of the Governor's conclusion that petitioner remains dangerous and is unsuitable for parole.[19]

■ It may be reasonable to conclude, as did the Court of Appeal majority, that petitioner's many years of sobriety, advanced age, and chronic health problems suggest he never again will consume alcohol, will not relapse into violent conduct, and thus does not remain a risk to public safety. As we stated in *Rosenkrantz, supra*, 29 Cal.4th 616, however, "the precise manner in which the specified factors relevant to parole suitability are considered and balanced lies within the discretion of the Governor. . . . It is irrelevant that a court might determine that evidence in the record tending to establish suitability for parole far outweighs evidence demonstrating unsuitability for parole. As long as the Governor's decision reflects *due consideration of the specified factors* as applied to the individual prisoner in accordance with applicable legal standards, the court's review is limited to ascertaining

---

[18] We note that expressions of insight and remorse will vary from prisoner to prisoner and that there is no special formula for a prisoner to articulate in order to communicate that he or she has gained insight into, and formed a commitment to ending, a previous pattern of violent behavior. In this case, however, the Governor's reliance on petitioner's lack of insight is amply supported by the record—both in petitioner's own statements at his parole hearing characterizing the commitment offense as an accident and minimizing his responsibility for the years of violence he inflicted on his family, and in recent psychological evaluations noting petitioner's reduced ability to achieve self-awareness.

[19] It is notable that, as was the situation in *Rosenkrantz, supra*, 29 Cal.4th at page 637, the Board, exercising its own judgment and discretion, determined that based upon the circumstances of the commitment offense and petitioner's lack of insight into his previous criminality, petitioner was *not* yet suitable for parole. It was only under the compulsion of the appellate court's decision in petitioner's first habeas corpus proceeding, which concluded that the Board's decision denying parole was not supported by any evidence and ordered the Board to grant parole unless some *new* evidence establishing unsuitability existed (thereby precluding the Board from considering all relevant statutory factors), that the Board ultimately issued a decision granting parole to petitioner. Thus, as Justice Benke concluded in dissent, the Governor, in setting aside the Board's reluctant and artificially constrained decision, vacated the decision rendered by the Court of Appeal majority rather than the decision of the Board.

whether there is some evidence in the record that supports the Governor's decision." (*Id.* at p. 677, italics added.)

In the present case, the decision made by the Governor reflects that he accorded petitioner individualized consideration with regard to all relevant statutory factors. The Governor's statement reflects he found that petitioner remains a current danger to the safety of the public, and specifically that the gravity of the offense and petitioner's lack of insight and failure to accept responsibility outweigh the factors favoring suitability for parole.[20] We have determined that some evidence in the record supports the Governor's decision. The Governor did not disregard petitioner's behavior in prison, but rather considered it to be one of several factors, although one outweighed by the gravity of the offense and petitioner's lack of insight into his long history of violence—factors that suggest petitioner remains a current danger to the public.

## V

For the reasons discussed above, the judgment of the Court of Appeal is reversed.

Kennard, J., Werdegar, J., and Moreno, J., concurred.

**CHIN, J.,** Concurring.—I agree that some evidence supports the denial of parole in this case, just as it did in the companion case of *In re Lawrence* (2008) 44 Cal.4th 1181 [82 Cal.Rptr.3d 169, 190 P.3d 535] (*Lawrence*). As he did in *Lawrence*, the Governor assessed the petitioner's case individually and considered all relevant factors before reaching a reasoned decision denying parole. Accordingly, as I stated in my dissent in *Lawrence*, we must defer to the judgment of the branch of government entrusted with the parole decision. (See *In re Dannenberg* (2005) 34 Cal.4th 1061 [23 Cal.Rptr.3d 417, 104 P.3d 783]; *In re Rosenkrantz* (2002) 29 Cal.4th 616 [128 Cal.Rptr.2d 104, 59 P.3d 174].)

I see no basis to distinguish this case (involving a conviction of *second* degree murder) from *Lawrence, supra*, 44 Cal.4th 1181 (involving a conviction of *first* degree murder) and to release Lawrence but deny parole to

---

[20] We note that although the Governor stated that the circumstances of the commitment offense were "alone sufficient" to justify a denial of parole, "it is not the circumstance that the crime is particularly egregious that makes a prisoner unsuitable for parole—it is the implication concerning future dangerousness that derives from the prisoner having committed that crime." (*Lawrence, supra*, 44 Cal.4th at pp. 1213–1214.) In the present case, the Governor's decision is supported by some evidence—not merely because the crime was particularly egregious, but because petitioner's failure to take full responsibility for past violence, and his lack of insight into his behavior, establish that the circumstances of petitioner's crime and violent background *continue* to be probative to the issue of his *current* dangerousness.

Shaputis. I therefore adhere to the views expressed in my *Lawrence* dissent (*Lawrence, supra,* 44 Cal.4th at p. 1230 (dis. opn. of Chin, J.)) and, accordingly, concur in the result only.

Baxter, J., and Corrigan, J., concurred.

Petitioner's petition for a rehearing was denied October 22, 2008. Werdegar, J., did not participate therein.