BERZON, Circuit Judge, with whom Judges THOMAS, FISHER, and PAEZ
join, concurring in part and dissenting in part:
Hayward contends that the Governor of California denied him release on parole without “some evidence” of his future dangerousness and that doing so violated the Due Process Clause. In the substantive part of its opinion that actually pertains to the merits of this case, Part III, the majority declines to decide whether the federal Constitution independently establishes a “some evidence” standard as part of the minimum process due to California prisoners denied parole, because the state’s constitutional law already does so. The majority then reviews the evidence of Hayward’s future dangerousness and concludes that some evidence supported the denial of parole. I concur in Part III of the opinion and offer in Part III of this concurrence some additional bases for the conclusion reached, further explaining, in particular, why federal district courts and this court in the future may reach “some evidence” questions arising in California parole cases on federal habeas, as we do here.
Before it reaches the issues actually raised by Hayward’s petition, however, the majority offers a lengthy disquisition on state prisoner release systems in general, apparently to rebut a constitutional proposition upon which Hayward never relies- — • that all state parole systems must impart a protectable liberty interest because all “good time” statutes do so. See Maj. Op. at 555. But in intimating[1] that the opposite is true- — -that parole systems do not uniformly create liberty interests — the majority commits the very error that it purports to correct, relying on broad generalizations about types of prisoner release systems instead of focusing on the particular state scheme at issue.
In fact, the Supreme Court’s precedents make obvious that the majority knocks down the most feeble of straw men when it disapproves a uniform federal rule regarding the. “some evidence” issue on parole, divorced from the particulars of each state’s statutory and decisional law. It is clear beyond cavil that the process due under the United States Constitution depends not on the label given to a particular early release program but on its characteristics under state law. The majority’s disembodied discussion of prisoner release systems in Part II is thus entirely superfluous.
More importantly, deciding constitutional issues in the air is simply not our job as judges. We are here to decide cases, not to issue advisory opinions on questions that may arise in another state at another time. Moreover, the majority’s lengthy *565 discussion of the non-issue of a blanket federal “some evidence” requirement for parole decisions is replete with errors and misdirection. For these reasons, I cannot join Part II of the opinion. I also part ways with the majority on the jurisdictional question, to which I turn first.
I.
The majority concludes that 28 U.S.C. § 2253(c)(1)(A) obliges a state prisoner to obtain a Certificate of Appealability (COA) to obtain review of a denial of parole. Although the matter is not free from doubt, for the reasons stated in White v. Lambert, 370 F.3d 1002 (9th Cir.2004), I would hold that “a COA is not required when a state prisoner challenges an administrative decision regarding the execution of his sentence.” Id. at 1010.
The majority ignores the significance of the statutory language of 28 U.S.C. § 2253(c)(1)(A) in the context of a challenge to prison administrative decisions. As we stated in White, “[h]ad Congress intended that every state prisoner obtain a COA before appealing, irrespective of the nature of the challenge, it easily could have said so.” Id. at 1012. Instead, the statutory language of § 2253(c)(1)(A) provides that a COA is necessary only when “the detention complained of arises out of process issued by a State court,” 28 U.S.C. § 2253(c)(1)(A) (emphasis added), indicating that the inquiry turns on the “target of the prisoner’s complaint,” not merely his status as a state prisoner. White, 370 F.3d at 1011. As we explained in White, had Congress intended the COA requirement to apply to all state prisoners because the relevant “detention” is “the state court decision that put the would-be parolee in prison,” see Maj. Op. at 553, it would have used the language it used in other provisions of the habeas statute — for example, in the exhaustion requirement, which applies to “a person in custody pursuant to the judgment of a State court,” 28 U.S.C. § 2254(b)(1). That language means precisely what the majority would hold the quite different language of § 2253(c)(1)(A) to mean. See White, 370 F.3d at 1011.
In the parole release context, the most plausible reading of § 2253(c)(1)(A) is that the “detention complained of’ is the petitioner’s continued imprisonment as a result of the parole board or Governor’s denial of parole, an administrative decision that does not “arise[ ] out of’ process issued by a state court. Accordingly, I would hold that because Hayward challenges “an administrative decision regarding the execution of his sentence,” White, 370 F.3d at 1010, he need not have obtained a COA to invoke this court’s jurisdiction.
I agree with the majority, of course, that if there is a COA requirement, a COA should issue in this case. In the end, then, the answer to the COA question does not matter to the outcome. Moreover, as the majority indicates, it is hard to conceive of a case in which requiring a COA would preclude review of a meritorious case. This court considers a notice of appeal as a request for a COA, and a COA issues unless the case is, in essence, frivolous.
Still, the COA requirement adds steps to the appeal of a potentially meritorious habeas case for the district court, the petitioner, and this court. We should not expand this requirement beyond what Congress intended. As that is what the majority has done, I dissent from its COA holding.
II.
The majority next engages in its abstract, superfluous discussion of state prisoner release systems, surveying a range of such systems — including, presumably be *566 cause it is the home of the author of the opinion, Alaska’s — and distinguishing between the general categories of “good time” and “parole.”
This extended discussion is dicta of the most objectionable type. Hayward has never argued that the Due Process Clause requires some evidence of future dangerousness for every parole denial without regard to state law. Nor has this court ever so held. The best the majority can do in explaining its generic discussion is to indicate that some of our opinions might “imply” — not hold — that the federal Due Process Clause on its own imposes procedural requirements for all state parole decisions, no matter whether the underlying state law makes the decision purely discretionary or not. Maj. Op. at 555. But we don’t usually sit en banc to overrule implications. In any event, there are no implications in our case law of the kind the majority conjures up to overrule.
In fact, as I explain, it is beyond dispute that the scope of due process liberty interests is determined by the attributes of the particular system created by the particular state, not by whether the system is designated as “good time” or “parole.” The upshot is that, if it has any effect at all, Part II of the majority opinion will only sow confusion.
A.
The Supreme Court has established a two-part framework for analyzing claims that the state has deprived an individual of a protected liberty interest without due process, a framework the majority does not acknowledge. First, we are to ask whether an individual has a protected liberty or property interest with which the state has interfered. Second, if the state has interfered with such an interest, we are to ask whether the procedures attending that deprivation of liberty were constitutionally sufficient. See Ky. Dep’t of Corr. v. Thompson, 490 U.S. 454, 460, 109 S.Ct. 1904, 104 L.Ed.2d 506 (1989).
Critically, although an individual claiming a protected liberty interest must have a “legitimate claim of entitlement” to that interest, the interest typically does not arise from the federal Due Process Clause itself but from “ ‘the laws of the States.’ ” Id. at 460-61, 109 S.Ct. 1904 (quoting Hewitt v. Helms, 459 U.S. 460, 466, 103 S.Ct. 864, 74 L.Ed.2d 675 (1983)); see also Vitek v. Jones, 445 U.S. 480, 488, 100 S.Ct. 1254, 63 L.Ed.2d 552 (1980) (“[S]tate statutes may create liberty interests that are entitled to the procedural protections of the Due Process Clause of the Fourteenth Amendment.”). Hayward has always maintained that his liberty interest in parole arises from the specifics of California’s parole scheme, not — as the majority would have it — directly from some ephemeral, uniformly applicable federal law.
To determine whether the California parole scheme gives rise to a constitutionally protected liberty interest, we are guided by the Supreme Court’s elucidation in the parole context of generally applicable due process principles. “In the air,” as the majority states, Maj. Op. at 555, an inmate does not have a “constitutional or inherent right ... to be conditionally released before the expiration of a valid sentence.” Greenholtz v. Inmates of Neb. Penal & Corr. Complex, 442 U.S. 1, 7, 99 S.Ct. 2100, 60 L.Ed.2d 668 (1979); Maj. Op. at 559-60. It is equally clear, however, that when a state’s parole scheme “creates a presumption that parole release will be granted” when or unless statutorily designated findings are made, an inmate does have a constitutionally protected expectancy of release on parole. See Greenholtz, 442 U.S. at 12, 99 S.Ct. 2100; Bd. of *567 Pardons v. Allen, 482 U.S. 369, 377-78, 107 S.Ct. 2415, 96 L.Ed.2d 303 (1987).
Contrary to the majority’s fundamentally misdirected analysis, then, the scope of federal constitutional liberty interests is determined by the attributes of the particular system created by the state, not by whether the system is designated as “good time” or “parole” or something else. As the Supreme Court has emphasized, each state’s parole statute “has [a] unique structure and language and thus whether [the] state statute provides a protectible entitlement must be decided on a case-by-case basis.” Greenhottz, 442 U.S. at 12, 99 S.Ct. 2100. It is therefore quite irrelevant how Alaska, for example, has structured its parole system; that the federal system has no “parole” program; or that there are differences between “good time” systems and “parole” systems generically defined. See Maj. Op. at 555-61. What would matter for purposes of Hayward’s claim that some evidence of future dangerousness is a component of the minimum process guaranteed by the Due Process Clause in this context is the nature and scope of the liberty interest provided by California’s parole system, considered in detail rather than superficially. See Greenhottz, 442 U.S. at 12, 99 S.Ct. 2100; Allen, 482 U.S. at 377-78, 107 S.Ct. 2415.
The opinion announces that it overrules a handful of this Circuit’s decisions recognizing protected liberty interests in parole release “[to the extent that they] might be read to imply that there is a federal constitutional right regardless of whether state law entitles the prisoner to release.” Maj. Op. at 555. But each of the cited decisions grounded its inquiry and holding — quite expressly — in the particular characteristics of the state scheme at issue, which in each case was the California scheme. See Irons v. Carey, 505 F.3d 846, 850 (9th Cir.2007) (“[T]he Supreme Court ha[s] clearly established that a parole board’s decision deprives a prisoner of due process with respect to this interest [created by California Penal Code section 3041] if the board’s decision is not supported by some evidence in the record.” (emphasis added) (internal quotation marks omitted)); Sass v. Cal. Bd. of Prison Terms, 461 F.3d 1123, 1127 (9th Cir.2006) (“[T]here is no constitutional or inherent right of a convicted person to be conditionally released before the expiration of a valid sentence.... [But] if a state statute uses mandatory language (‘shall’) to create a presumption that parole release will be granted when the designated findings are made, the statute creates a liberty interest in parole.” (internal citations and quotation marks omitted)); Biggs v. Terhune, 334 F.3d 910, 915 (9th Cir.2003) (“Because the California parole scheme vests in every inmate, a constitutionally protected liberty interest ..., the requirements of due process are satisfied if ‘some evidence’ supports the [parole] decision.” (emphasis added)). Accordingly, there is no implication — much less any holding— for this en banc panel to “overrule.”
B.
The majority’s discussion of parole is an object lesson in why the due process inquiry — or, for that matter, any judicial inquiry — cannot sensibly be conducted in the air. The opinion repeatedly asserts that prisoners may be denied parole at the state’s discretion, whereas good time is nondiscretionary. Maj. Op. at 556-58. But whether either is so depends on what state law provides. States may — as California has done — create an indeterminate sentencing scheme and require that prisoners who have served their minimum term will be released if certain circumstances exist. The Supreme Court has made clear that official discretion in the *568 due process context is not all-or-nothing but relative, and that limitations on official discretion such as those California has adopted for its parole release system can give rise to a federal liberty interest. See Olim v. Wakinekona, 461 U.S. 238, 249, 103 S.Ct. 1741, 75 L.Ed.2d 813 (1983) (“[A] State creates a protected liberty interest by placing substantive limitations on official discretion.”). Again, whether there are such limits on discretion turns on the details of the particular state scheme. See Allen, 482 U.S. at 375, 107 S.Ct. 2415 (“[A]n official has discretion when the standards set by a statutory or regulatory scheme cannot be applied mechanically.” (internal quotation marks omitted)). Divorced from context, then, generalizations about “discretion” only mislead.
More fundamentally, because the majority does not offer its general observations on parole and good time in the course of deciding any question that is actually raised by Hayward’s petition, the observations are advisory and so useless to the proper development of the law. See Flast v. Cohen, 392 U.S. 83, 96-97, 88 S.Ct. 1942, 20 L.Ed.2d 947 (1968) (“[T]he rule against advisory opinions [ensures] that clear concreteness provided when a question emerges precisely framed and necessary for decision.... ”). The opinion announces that the good time and parole contexts “differ,” and discusses the differences between the two at some length. But because, as I have explained, neither good time nor parole creates due process rights without reference to the particular state system at issue, one is left wondering what the relevance of this discussion of Platonic ideal types might be. It is clear — even if little else about Part II is — that these generalizations do not require future courts to ignore Supreme Court precedent, our precedent, and the actual characteristics of the state schemes they are called on to evaluate.
III.
As I have indicated, I am nevertheless in general agreement with Part III of the majority opinion, which holds cognizable on habeas review claims that California parole denials were made without “some evidence” of future dangerousness. The majority declines to employ the Supreme Court’s framework for determining whether California parole statutes create protected liberty interests, relying instead on the fact that California’s own constitutional law requires that “some evidence” under-gird parole denials. Although I would approach the question a bit differently, I believe the majority’s ultimate conclusions sound and offer here some additional considerations in support of them.
The California Supreme Court has held that, as a matter of state constitutional law, some evidence must support the Governor’s decision denying parole. See In re Lawrence, 44 Cal.4th 1181, 82 Cal.Rptr.3d 169, 190 P.3d 535, 547-48 (2008); In re Shaputis, 44 Cal.4th 1241, 82 Cal.Rptr.3d 213, 190 P.3d 573, 580 (2008). But the Court has consistently refrained from deciding whether the federal Constitution also so requires. See, e.g., In re Rosenkrantz, 29 Cal.4th 616, 128 Cal.Rptr.2d 104, 59 P.3d 174, 205 n. 12 (2002) (“Because we conclude as a matter of California law that the ‘some evidence’ standard of review is applicable to judicial review of a Board’s decision denying parole, we have no occasion to determine whether the same standard is also mandated under federal constitutional principles.”). By denying relief without addressing the federal issues, the California courts have implicitly determined that the federal Constitution does not impose procedural or evidentiary standards more stringent than those imposed by the California Constitution. Be *569 cause Hayward does not contend otherwise, and we have never so held, this case does not present an occasion to disturb the California Supreme Court’s implicit holding on that question.
It is likewise appropriate for the majority to rely on the California Supreme Court’s articulation of state constitutional requirements in determining what the federal Constitution requires in this case. Federal due process rights typically arise from state law entitlements, see Thomson, 490 U.S. at 460, 109 S.Ct. 1904, and there is no reason to think that state constitutional law may not place mandatory limits on official discretion, giving rise to “a presumption that parole release will be granted” and creating a protected liberty interest, Allen, 482 U.S. at 377-78 & n. 10, 107 S.Ct. 2415, just as statutes may do. That is exactly what the California Supreme Court has determined the California Constitution does with regard to parole denial, see Lawrence, 82 Cal.Rptr.3d 169, 190 P.3d at 548, and the majority correctly relies on that decisional law as defining a quantum of evidence requirement, without deciding whether the interest would exist in the absence of that decisional law. Moreover, the arbitrary disregard of process guaranteed by state constitutional law may violate the federal Constitution’s guarantee of due process. See Hicks v. Oklahoma, 447 U.S. 343, 346, 100 S.Ct. 2227, 65 L.Ed.2d 175 (1980). For that reason, the majority is correct to review the state court decision here for compliance with the California Constitution’s requirement of “some evidence” of future dangerousness. The federal Due Process Clause requires at least that much.
Applying the “some evidence” rule in light of the consideration that review of that factual determination is governed by AEDPA’s deferential standards, see 28 U.S.C. § 2254(d), I conclude that the state courts’ decision that Hayward was properly denied parole was not an unreasonable conclusion on the record of the pertinent parole proceeding. In interpreting the statutes and regulations governing California’s parole system, the California Supreme Court recently held that its caselaw “recognize[s] that the paramount consideration for both the Board and the Governor under the governing statutes is whether the inmate currently poses a threat to public safety and thus may not be released on parole.” Lawrence, 82 Cal.Rptr.3d 169, 190 P.3d at 552 (citing In re Dannenberg, 34 Cal.4th 1061, 23 Cal.Rptr.3d 417, 104 P.3d 783, 786 (2005); Rosenkrantz, 128 Cal.Rptr.2d 104, 59 P.3d at 202). The suitability and unsuitability factors may guide the Board or the Governor in their determination that a prisoner remains dangerous to the public, but “[i]t is not the existence or nonexistence of suitability or unsuitability factors that forms the crux of the parole decision; the significant circumstance is how those factors interrelate to support a conclusion of current dangerousness to the public.” Id. at 553. “Accordingly ... the relevant inquiry is whether some evidence supports the decision of the Board or the Governor that the inmate constitutes a current threat to public safety, and not merely whether some evidence confirms the existence of certain factual findings.” Id.
In light of Shaputis, 82 Cal.Rptr.3d 213, 190 P.3d at 580, I cannot conclude that the state trial court unreasonably determined that there is some evidence to support the Governor’s decision. I note, in addition to the factors cited by the majority, that the attack leading to Hayward’s conviction was not an isolated incident of brutality. The murder was, instead, the culmination of a long history of violence and criminal activity stretching back to as early as age eight. See id., 82 Cal.Rptr.3d 213, 190 P.3d at 584 *570 (describing the crime of conviction as the “culmination” of several years of violent behavior). Hayward had been arrested at least twenty times prior to the murder, on charges ranging from armed robbery, to assault and battery, to attempted murder. He previously served a prison term for assault with a deadly weapon. As in Shaputis, these circumstances reasonably establish that the attack was not committed during a period of “emotional stress that was unusual or unlikely to recur.” Id. The assault on Hayward’s then-girlfriend occurred eight months before the murder, and Hayward claims that his initial feelings of extreme rage over the incident subsided as time went on. Ultimately, according to the evidence, Hayward inflicted the fatal violence only after the drunk victim lobbed a beer bottle at his companion. See Cal.Code Regs. tit. 15, § 2402(c)(1)(E) (noting that a factor favoring an unsuitability determination exists where “[t]he motive for the crime is inexplicable or very trivial in relation to the offense”).
These static historical factors suggest that, without any doubt, Hayward once was an extreme danger to public safety. But, after more than fifteen years of denying stabbing his victim, Hayward ultimately accepted responsibility for the crime in 1993, more than fifteen years ago. And, although there is some indication that he made statements suggesting he lacked remorse in a 1997 psychological evaluation, more than ten years have elapsed since that time. Moreover, the record does not reveal any violence or serious discipline within the last fifteen years of Hayward’s incarceration. As the California Supreme Court has recently indicated, to focus completely on unchanging factors such as the commitment offense and preincarceration history is at odds with a parole system that assumes, as its basic premise, that some rehabilitation is at least possible. See Lawrence, 82 Cal.Rptr.3d 169, 190 P.3d at 559 (“[I]t is evident that the Legislature considered the passage of time— and the attendant changes in a prisoner’s maturity, understanding, and mental state — to be highly probative to the determination of current dangerousness.”). Over time, the ability of the commitment offense and pre-incarceration history to demonstrate current dangerousness diminishes. See id., 82 Cal.Rptr.3d 169, 190 P.3d at 560.
Still, Hayward’s most recent psychological evaluation reasonably can be read to indicate that Hayward had not yet reached that point, and the Governor so read it. The evaluation concluded that measures of both static and dynamic risk factors associated with violence placed Hayward in “a category that represents a low to moderate risk for future violence in the community.” These factors include the violent criminal history just described, as well as early adjustment problems in the prison community, “episodes of relationship instability,” including current estrangement from two of his daughters, and a history of substance abuse problems, including prior use of cocaine and marijuana. The evaluations are far from damning — they cite Hayward’s “increased level of maturity and insight, his participation in substance abuse recovery” — and they indicate that the “historical risk factors now seem to be adequately contained.” Nevertheless, the evaluation concludes that Hayward presents a “low to moderate risk” of danger to the community. The state court did not unreasonably determine that this evaluation, and the evaluation’s assessment of Hayward’s commitment offense and his violent history, are evidence that Hayward’s release would pose a possibly “moderate” *571 risk to public safety.[2]
I accordingly join Part III of the court’s opinion and its conclusion that the petition for habeas corpus must be denied.

. I say intimating because Part II of the majority opinion contains no holding.

. I note that the psychological evaluation cited in the Governor’s decision was conducted in March 2002, more than seven years ago. Over time one’s psychological status is likely to change, so the 2002 evaluation and other assessments would in all likelihood not support the conclusion that Hayward would pose a risk to public safety if released now. But we are reviewing the parole release decision as of when it was made, not now. For any future parole release decisions, the Board would likely arrange for a new psychological evaluation, an evaluation which could well differ from the 2002 report in both its content and its conclusions. Subsequent Boards or Governors will therefore be able to reassess Hayward’s then-current dangerousness in light of more contemporary reports, and could reach a conclusion different from that of Governor Davis in 2003.