[Nos. A122964, A124744. First Dist., Div. Three. Nov. 4, 2009.]

In re BRUCE A. CERNY on Habeas Corpus.

**COUNSEL**

Benjamin Ramos for Plaintiff and Respondent Bruce A. Cerny.

Edmund G. Brown, Jr., Attorney General, Anya M. Binsacca, Assistant Attorney General, and Denise A. Yates, Deputy Attorney General, for Defendant and Respondent State of California.

**OPINION**

**SIGGINS, J.**—Petitioner Bruce A. Cerny committed a second degree murder in 1980 that was enhanced due to his use of a firearm. He was sentenced to 17 years to life in prison and has been in prison ever since. At the time of the murder, Cerny was a chronic drug abuser. He claims he has been drug free since entering prison, and there is no evidence he has abused any substance since 1981. He has regularly participated in Narcotics Anonymous since 1989, and since then he has not been disciplined for violating prison rules. He has the lowest classification score possible for a prisoner serving a life sentence and the most privileged form of prison custody allowable for his classification. He now challenges the two most recent (2007 & 2008) decisions by California's Board of Parole Hearings (the Board) to deny him parole for the 13th and 14th time since he was first eligible for parole consideration.[1]

This case requires us to apply the standard of review articulated by the California Supreme Court in two cases, *In re Lawrence* (2008) 44 Cal.4th 1181

---

[1] Shortly before our oral argument on Cerny's petition challenging the 2007 decision, he filed a second petition, challenging the 2008 decision. Although the two petitions are not identical, they raise key issues with significant overlap. Thus, on May 4, 2009, even though Cerny did not seek review of the Board's 2008 parole denial decision in superior court, we ordered the hearing off calendar, consolidated the two petitions, and set a briefing schedule.

[82 Cal.Rptr.3d 169, 190 P.3d 535] and *In re Shaputis* (2008) 44 Cal.4th 1241 [82 Cal.Rptr.3d 213, 190 P.3d 573]. We are to review the Board's actions to determine whether the decisions to deny Cerny a parole date are supported by some evidence that Cerny's release at this time will endanger public safety. (*In re Lawrence, supra*, at p. 1209.) We are not to engage in balancing and thereby second-guess the Board. Rather, we are required to look only for evidence of dangerousness that could support the Board's decisions. (*Ibid.*) Although these standards are relatively simple and straightforward to articulate, as this case demonstrates, they are more vexing to apply.

The primary issue presented by these petitions is whether the Board properly found Cerny unsuitable for parole because his postrelease plans were indefinite. The Board's regulations list factors the Board is to consider in hearings to determine whether a prisoner is suitable for parole. Certain factors indicate unsuitability, and others indicate suitability. Sufficient postrelease plans are listed in the Board's regulations as a factor favoring suitability, but inadequate plans are not listed as a factor indicating an inmate is unsuitable for parole. The regulations also provide that: "Circumstances which taken alone may not firmly establish unsuitability for parole may contribute to a pattern which results in a finding of unsuitability." (Cal. Code Regs., tit. 15, § 2402, subd. (b).) Moreover, in accord with our Supreme Court's instruction in the *Lawrence* case, "the importance attached to any circumstance or combination of circumstances [tending to show suitability] in a particular case is left to the judgment of the [parole] panel." (Cal. Code Regs., tit. 15, § 2402, subd. (d).)

In light of Cerny's extensive history of drug abuse and dependence, the Board's concern about his uncertain plans for parole was justified. The more difficult issue presented by these petitions is whether standing alone, the absence of this factor that favors suitability can serve as a basis to deny parole. As we explain, although we would decide this case differently if so empowered, our standard of review requires that we deny these petitions because we are not empowered to engage in the kind of balancing of factors that is entrusted to the Board in the first instance.

## FACTUAL AND PROCEDURAL BACKGROUND

At the time of the murder, Cerny was living in San Francisco with his girlfriend, Jerri Becker. Both were heroin users. On March 3, 1980, Becker went to purchase heroin from Daisy Rutter and the murder victim, Ricky Caponio, at their houseboat in Sausalito. Becker paid them $60. The next day

Rutter and Caponio left the houseboat to procure the drug. While they were gone, Becker returned several times looking for heroin, and appeared to be very upset that she did not have it. Rutter and Caponio later returned to the houseboat and fell asleep until Barbara Paschal arrived with some heroin. While Paschal was there, Becker and Cerny arrived. Becker kicked in the door, and angrily accused Rutter of stealing her money without delivering the drugs. Rutter and Becker began to wrestle and Rutter pushed Becker out the door. At that point, Rutter noticed Cerny, who had a handgun.

Rutter, Caponio, and Cerny struggled for the gun and, momentarily, Caponio and Rutter seemed to overpower Cerny so that the gun was pointing at him.[2] Caponio threatened to shoot Cerny. Just then Rutter thought she saw Becker take out a gun and she started wrestling with Becker. When she began to wrestle with Becker, Rutter heard a gunshot and saw Caponio fall. Cerny was holding the gun. While Rutter attended to Caponio, Becker and Cerny argued with her and Paschal about the money and the heroin. Cerny suggested to Becker that they also kill Rutter, but Becker dissuaded him. Becker then threatened Rutter not to talk about the incident, and she and Cerny left the houseboat. They were apprehended on the dock before they could flee.

In July 2007, the Board denied Cerny parole, based in part, on his commitment offense. The Board determined that Cerny killed in a dispassionate manner that demonstrated an exceptionally callous disregard for human suffering, and for a trivial motive—a $60 drug deal gone bad. The Board also supported its decision with findings that Cerny had an "escalating pattern of criminal conduct in his adult life involving drug-related crimes," had "failed previous grants of probation," had an "unstable social history and prior criminality," including "polysubstance abuse with use of LSD, cocaine, alcohol, methamphetamine, heroin and marijuana," and two AWOL's from the United States Army. Cerny's parole plans were also considered insufficient because they "do not appear to be solid or verifiable in the areas of residency or employment," despite prior recommendations that he have such verifiable plans.

The Board also noted several factors that favored parole and commended Cerny for remaining discipline free since his last hearing, for his long-term commitment to Narcotics Anonymous, and his work as a library clerk. He

---

[2] Rutter recalls participating in the struggle for control of the gun, but Cerny does not recall her being involved. Cerny also states that Caponio's seven-year-old son left the houseboat at the time of the incident.

had positive reports from prison officials and good support from his sister. The Board did not question Cerny's psychological evaluation which concluded that he had below average propensity for violence compared to other prison inmates and that in the community his propensity for violence was "less than that of the average citizen." The assessment was based in part on Cerny's minimal disciplinary history since 1984 and the skills he acquired in various self-help groups such as anger management, alternatives to violence, communication, and Narcotics Anonymous.

The 2008 panel which denied parole was a two-person panel, comprised of Presiding Commissioner Sandra Bryson and Deputy Commissioner Booker Welch. At the hearing, Presiding Commissioner Bryson's rationale to deny parole was similar to that expressed by the Board in 2007. First, she relied on Cerny's commitment offense. He used a gun, multiple victims were involved, the motivation for the crime was trivial, and despite having the opportunity to cease his activity, he did not do so. She also stated that the Board found that he displayed "precious little remorse" for his crime. In expressing his decision, Deputy Commissioner Welch said his only concern about granting parole was Cerny's parole plans, and he said nothing of Cerny's lack of remorse.[3] He described Cerny as "almost a model prisoner." Commissioner Bryson also noted that although Cerny was able to discuss the steps in Narcotics Anonymous, he could use "continuing work" so that he could more readily discuss the tools provided by that program.

The only basis for denial expressed by both commissioners was Cerny's lack of definite parole plans. He claimed to have approximately $17,000, but provided no documentation to substantiate his claim. Similarly, there was no documentation that his son would provide Cerny the support that he claimed he would. The Board was also concerned that Cerny's son had convictions for drug-related offenses and could possibly be an adverse influence on his father.[4]

The "biggest issue" the 2008 Board expressed about Cerny's future was the possibility that he would relapse into using drugs. It determined that Cerny's reaching out to various postrelease drug rehabilitation programs was

---

[3] In light of Commissioner Welch's comments that he was solely concerned about Cerny's uncertain parole plans, Presiding Commissioner Bryson's remarks may be her personal observation rather than a Board conclusion.

[4] Cerny described his son as someone who, in his early 20's, had been convicted on drug and weapons charges but, after serving time, had straightened himself out and worked his way up in the hotel industry to his current position of assistant manager. As a result of his good postincarceration behavior, he claimed his son had been able to reduce his prior felony convictions to misdemeanors. Because of the son's work in the hotel industry, Cerny thought it would be particularly easy for his son to arrange transitional accommodations for him, should they be required.

inadequate because none of them promised to provide him housing or employment. Accordingly, the Board encouraged Cerny to seek a commitment from an out-of-county relapse prevention program and to look into attending Narcotics Anonymous when released. He was denied parole for one year.

## DISCUSSION

■ Our Supreme Court has articulated the standard we employ to review parole suitability decisions. "[B]ecause the core statutory determination entrusted to the Board and the Governor is whether the inmate poses a current threat to public safety, the standard of review properly is characterized as whether 'some evidence' supports the conclusion that the inmate is unsuitable for parole because he or she currently is dangerous." (*In re Lawrence, supra*, 44 Cal.4th at p. 1191.) Thus, we examine the record of Cerny's parole consideration hearings to determine what, if any, evidence supports a conclusion that he is currently dangerous.

### A. *The Commitment Offense*

■ In order for the immutable factor of a prisoner's commitment offense to support a parole denial decision, the callousness, viciousness or other egregious quality of the offense must be *"probative* to the central issue of *current* dangerousness . . . ." (*In re Lawrence, supra*, 44 Cal.4th at p. 1221.) Here, one might dispute whether the Board could accurately characterize Cerny as having an "exceptionally callous disregard for human suffering" or whether the motive was inexplicable or very trivial. For example, in 2004, the trial judge wrote a letter to the Board challenging the district attorney's characterization of the crime as "heinous," and instead calling it an "everyday drug transaction." But we need not decide whether the Board's characterization of the commitment offense is supported by the evidence because, even if we are to assume the Board is correct, we can discern no evidence that the circumstances of the offense are probative of his current dangerousness.

There are no facts that tie Caponio's murder, committed in 1980, to Cerny's current propensity for violence 29 years later. Cerny's involvement in this murder was largely a function of his drug abuse. For example, his 1991 psychological evaluation states, "Mr. Cerny's addiction to heroin and barbiturates and Valium[] was a major contributing factor which predisposed him to the commitment offense." His 2006 psychiatric evaluation, the most recent before the Board's 2007 hearing, outlines his substance abuse history: he began drinking alcohol at 17, started smoking marijuana at 19, and began using heroin at 24, which escalated over time until he was approximately 32, when he used it daily. He also used cocaine, LSD, and methamphetamine.

Cerny claims, however, that he has not used any drugs or alcohol since 1980 and there is no record of his abusing drugs or alcohol since shortly after he entered prison.[5] He has participated regularly in Narcotics Anonymous since 1989. Given the close nexus between Cerny's history of drug abuse and the circumstances of his commitment offense, the substantial amount of intervening time during which there is no evidence that Cerny has committed any violent act or abused drugs, and his long-standing treatment for drug abuse, Cerny's commitment offense no longer provides evidence that he is currently dangerous or that his release would unreasonably endanger the public.

B. *Escalating Criminal Conduct and Failure on Previous Grants of Probation*

In articulating its decision to deny Cerny parole, the 2007 Board also stated, "the prisoner has no prior juvenile history, but does show an escalating pattern of criminal conduct in his adult life involving drug-related crimes. He has failed previous grants of probation and cannot be counted upon to avoid criminality at this point, has failed to profit from society's previous attempts to correct his criminality through adult probation which he failed, as well as several county jail stays through short stays." Cerny disputes these findings and argues that consideration of his escalating criminality necessarily violates this court's 2003 order prohibiting the Board from relying on his past marijuana-related offenses for any purpose.[6] We agree.

Although the probation officer's report prepared for Cerny's sentencing indicates that he had "no prior arrests or convictions," and California's Department of Motor Vehicles records reflected only a 1979 traffic violation for making an illegal right turn, Cerny's criminal history is more extensive. At the 2007 hearing, Cerny acknowledged (1) a February 1967 charge of grand theft auto which was dismissed; (2) an October 1968 conviction for possession of a marijuana pipe; (3) an October 1969 conviction for being under the influence of drugs; (4) a 1970 conviction for contributing to the delinquency of a minor (smoking marijuana with the minor); (5) a 1972 arrest for disorderly conduct; and (6) an April 1973 conviction for operating a motor vehicle while impaired by alcohol.

---

[5] Cerny was disciplined for sniffing paint in 1981. Although Cerny denies he did so, there is no discipline or other evidence of any kind of drug abuse more recent than October 1981.

[6] In 2003, Cerny challenged a prior unsuitability decision based, in part, on "several marijuana-related misdemeanors in the late 1960s and early 1970s." (*In re Cerny* (May 21, 2003, A100880) [nonpub. opn.].) We ordered the Board not to rely on those convictions "for any purpose, including its determination of petitioner's suitability for parole."

We cannot tell from the record of the 2007 hearing whether the Board relied on Cerny's "several marijuana-related misdemeanors" when it concluded that his escalating pattern of criminality indicates he would present a threat to the public if he is released. For example, Cerny's October 1969 conviction for "being under the influence of drugs" may have been a marijuana-related conviction (and, therefore, not a legitimate basis for the Board's decision), but the description in the transcript is inadequate to be certain.

Moreover, even if we assume that the Board only relied on crimes not involving marijuana to conclude that Cerny's escalating pattern of criminality renders him unsuitable for release, we are unable to discern evidence that suggests his criminal history had predictive value in determining his current risk to the public. Cerny is now 63 years old. His criminal history does not demonstrate escalating violence that led up to his commitment offense as contemplated by the Board's regulations. (See Cal. Code Regs., tit. 15, § 2402, subd. (c)(2).) Instead, all of Cerny's crimes were committed while he was already drinking alcohol, smoking marijuana and using heroin. Cerny has stopped using drugs and alcohol and is committed to remaining abstinent. Because so much time has elapsed since those crimes were committed, Cerny's drug abuse is inseparable from his criminal history, and his criminal history discloses no history of escalating violence; his criminal history is simply too far removed both in time and behavioral attributes to constitute reliable evidence that Cerny is currently dangerous.[7]

C. *Unstable Social History*

Analysis of Cerny's social history is also inseparable from his history of addiction and drug abuse. The 2007 Board's denial of parole relies on Cerny's "use of LSD, cocaine, alcohol, methamphetamine, heroin and marijuana," and his two absences without leave from the Army that "were due to [his] growing drug addiction." These facts lead the Board to conclude that Cerny's social history is unstable and counterindicative of his suitability for parole. At the same time, the Board commended Cerny for his "long-term

---

[7] The record before us is also unclear exactly when Cerny was on probation. It appears that he was put on probation for being under the influence of drugs in 1969, and he violated his probation when he contributed to the delinquency of a minor in 1970. Reliance on these offenses may be improper due to our prior order. Regardless, just as with his escalating criminal history, any violation of probation occurred during the time petitioner was seriously abusing drugs and does not appear to involve violence. Because of his rehabilitation record, that history is no longer predictive of his current risk of dangerousness.

commitment to [Narcotics Anonymous]" and his stable relationship with his sister. The record of Cerny's hearing also indicates that he has ongoing relationships with his son, brother, nieces and nephews, although at the time of the 2007 hearing Cerny was not in contact with his son as frequently as he had been in the past.

As we have said, there is no record of Cerny abusing any substance since 1981, and he claims that he has refrained from illicit drug use since 1980. He has regularly participated in Narcotics Anonymous since 1989. Moreover, Cerny plans to continue his treatment for drug dependence and abuse when he is paroled. As the negative factors in Cerny's social history relied upon by the Board to deny Cerny parole were all due to his drug abuse, we cannot conclude that Cerny's social history, in light of his abstinence, treatment and parole plans, provides evidence that he would pose a current danger to the public if released to parole.[8]

### D. Cerny's Lack of Remorse

As we stated above, in the 2008 hearing, Presiding Commissioner Bryson found that Cerny demonstrated "precious little remorse today for this crime." As part of her reasoning to deny parole, she explained to Cerny, "You have really not expressed your feelings here to this Panel as far as this crime goes. Perhaps it has to do with the number of times you've talked about it. I don't know. But, in fact, your story is, in general terms what we have in the reports as happening, but, basically, a sum of the specifics have been basically glossed over." Commissioner Bryson thus faults Cerny for failing to express sufficient remorse for his crime and his failure to explain the events in sufficient detail.

But the record of the 2008 hearing shows that the facts of Cerny's crime were incorporated by reference from his probation report, and Commissioner Bryson questioned him extensively on its details. When the deputy commissioner was given an opportunity to question Cerny about his crime, he confirmed that he had spoken with Cerny about the crime in previous hearings and asked no other questions about it. The panel never asked Cerny about his feelings over what happened or whether he harbored any regrets.

---

[8] Early in Cerny's incarceration, it was suggested that some of his social instability may have been due to some type of psychosis or schizophrenia. But, by 1990, any such prior diagnoses were questioned, and were refuted by 1995 and in later evaluations. Currently, Cerny's only diagnosed disorder is "polysubstance abuse/dependence in institutional remission."

Nevertheless, the record of the 2008 hearing is not silent on whether Cerny was remorseful for his 1980 killing of Ricky Caponio. When the panel was discussing Cerny's participation in Narcotics Anonymous with him, Cerny said the victim's son was the person he most sought to make amends with for his wrongdoing. He also mentioned that at the time of his trial, Cerny's ex-wife delivered an apology on his behalf to the victim's brother. Cerny also began his closing statement to the Board with an apology to his victims.

Documentation available to the Board at the hearing also includes references to Cerny's remorse for the tragic events of his crime. In a psychological evaluation of Cerny conducted in 2006, he discussed an incident that occurred in the prison that reminded him of his crime and said: "A fellow in chow hall died suddenly the other day, and this reminded me of the victim as he died. This memory has stayed with me and I feel very bad. He had a son. I took a father away from that son. And not only did I mess with his family, but I hurt my family as well. I wish it would have turned out differently. I never planned or expected to kill him. I thought we would get the money back and leave." This passage from the psychological report was read into the record at Cerny's 2007 hearing. His psychological evaluation prepared for the 2008 hearing also quotes Cerny saying, "I'm very sorry. I feel badly for the victim and for his family. He had a child, and the child didn't deserve that. No one deserves that."

In light of this record, the commissioner's determination that Cerny showed precious little remorse for his life crime is unsupported by the evidence. We see nothing to suggest that Cerny is dismissive or cavalier when discussing it, and the records of the 2007 and 2008 hearings include several spontaneous expressions of remorse.

E. *Cerny's Parole Plans*

The only remaining basis that can support the Board's decisions to deny Cerny parole is the determination that he lacks sufficient plans for release. The facts and evidence are not in dispute. The 2007 and 2008 panels concluded that Cerny's plans did "not appear to be solid or verifiable in the areas of residency or employment." Cerny's intended residency remains up in the air because he wants to get outpatient treatment for his drug addiction or live in a residential treatment facility when he is paroled, but he has not yet been accepted into such a program. Cerny's employment plans are considered to be unverified because, while the Board acknowledges that he has marketable skills, he does not have a job waiting for him and has not shown what he has done to find one.

 The sufficiency of a prisoner's future plans is listed in the Board's regulations as a factor that may indicate a prisoner's suitability for parole. (Cal. Code Regs., tit. 15, § 2402, subd. (d)(8).) But in this case we are required to consider whether an inmate's inability to demonstrate a suitable plan for release may be the only factor that demonstrates his unsuitability. In other words, standing alone, does an uncertain plan for postrelease housing and employment demonstrate that an inmate's parole will pose a threat to public safety?

There appears to be no real concern over Cerny's ability to secure employment. Both the 2007 and 2008 panels stated that Cerny has marketable skills, and that is all the Board's regulations literally require. (See Cal. Code Regs., tit. 15, § 2402, subd. (d)(8).) He had a stable job history before entering prison, and worked installing aluminum siding, remodeling, doing plumbing work, and driving a taxi. In prison he has held a variety of jobs that includes work in the library, in the print shop, in the kitchen, and on the yard crew. He also worked making license plates, doing maintenance, doing woodwork, and as a building porter. He is experienced in air-conditioning repair, but considers welding and sheet metal work to be his primary vocational skill. Whether Cerny will be fully employed following his release from prison depends, in part, upon the type of program he enters to continue his treatment for drug addiction.

Our assessment of the Board's reliance on Cerny's lack of suitable parole plans is difficult due to the responses Cerny and his sister received from various residential treatment facilities and service providers about Cerny's possible residential placement upon his release. He presented documentation to the Board that indicates those agencies contacted on his behalf are willing to assist Cerny when he is released from prison. But none of them will save a place for him in their program unless and until Cerny secures a parole date. Cerny responded to the Board's concerns to no avail by stating that he could live in a hotel for the time it takes him to find a residential program opportunity because he has $17,000 and his sister is willing to help him.

We are concerned that Cerny is caught in an untenable situation. He says the treatment programs he has contacted will not accept him until he has a parole date. Yet, the Board will not give Cerny a date until he is accepted into a program. As we said above, the Board cited reasons other than Cerny's lack of suitable parole plans when it denied him parole in 2007. But in the 2008 decision, Cerny's lack of suitable plans was the only factor both panel members relied upon to deny parole.

The Board should realistically and reasonably implement its regulations when deciding an inmate's suitability for parole. When an inmate's parole planning is the only factor that militates against suitability, it is difficult to see how public safety demands that the inmate be found unsuitable until he secures commitments that he cannot get in the absence of a parole date. In light of the Board's expansive power to set conditions of parole, nothing prevents it from granting a future parole date that is conditional upon an inmate's acceptance into a residential treatment facility or other appropriate program. (Pen. Code, §§ 3052–3053; *Terhune v. Superior Court* (1998) 65 Cal.App.4th 864, 874 [76 Cal.Rptr.2d 841].) Doing so seems to strike the appropriate balance between the Board's duties to protect public safety and afford prisoners realistic opportunities to secure parole.

But *In re Lawrence* instructs us that striking the appropriate balance is the Board's responsibility, not ours. In this case, the Board's concerns that Cerny could relapse into drug abuse if he is released without firm and verifiable plans to treat his addiction are valid. His intention to live in a residential treatment program was characterized by prison psychologists as "appropriate" and reflective of Cerny's "solid insight" into his addiction. Were we empowered to direct the Board's exercise of its discretion, we would remand this matter to require the Board to set a future parole date for Cerny that is conditional upon his finding suitable housing and treatment. But we are not.

■ On this record, our power of review is limited to determining whether some evidence supports the Board's action. However, if factors remain unchanged and the Board continues to deny Cerny parole in spite of his best efforts to secure a commitment of suitable housing upon his release, it may be necessary for us to act. Long before the companion decisions in *Lawrence* and *Shaputis*, our Supreme Court determined that fundamental fairness requires that prisoners be provided a written statement of definitive reasons when the Board acts to deny parole. (*In re Sturm* (1974) 11 Cal.3d 258 [113 Cal.Rptr. 361, 521 P.2d 97].) In discussing the legal genealogy of prisoner rights in parole hearings, the court said that California law recognizes the rights of parole applicants to be free from arbitrary decisions, to secure information necessary to prepare for parole hearings, "and to something more than mere pro forma consideration. Under time-honored principles of the common law, these incidents of the parole applicant's right to 'due consideration' cannot exist in any practical sense unless there also exists a remedy against their abrogation. [Citation.] Hence, our prior recognition of a right to due consideration of parole applications necessarily gives rise to a concomitant right to an available remedy." (*Id.* at pp. 268–269.)

## CONCLUSION

■ The 2008 decision of the Board to deny Cerny parole is supported by evidence that Cerny might revert to his prior drug use and, thus, become a danger to public safety if he is released without firm, verifiable parole plans. Thus, the petitions for writs of habeas corpus are denied. Should Cerny's case factors remain unchanged, the Board should consider setting Cerny a future parole date that allows sufficient time for him to make definite arrangements for his placement, and set appropriate conditions which Cerny must meet before his release to ensure that he enters a supervised, structured and supportive environment. (See Cal. Code Regs., tit. 15, § 2402, subd. (b).)

McGuiness, P. J., and Jenkins, J., concurred.

A petition for a rehearing was denied November 13, 2009, and the petition of respondent Bruce A. Cerny for review by the Supreme Court was denied February 3, 2010, S178253. George, C. J., and Corrigan, J., did not participate therein.