**FOR PUBLICATION**

# UNITED STATES COURT OF APPEALS
# FOR THE NINTH CIRCUIT

JOHN H. PIRTLE,
           *Petitioner-Appellee,*

v.

CALIFORNIA BOARD OF PRISON
TERMS; D. L. RUNNELS; ATTORNEY
GENERAL FOR THE STATE OF
CALIFORNIA,
           *Respondents-Appellants.*

No. 07-16097

D.C. No.
CV-04-00518-
FCD/KJM

OPINION

Appeal from the United States District Court
for the Eastern District of California
Frank C. Damrell, District Judge, Presiding

Argued and Submitted
March 12, 2008—San Francisco, California

Submission Vacated December 3, 2008
Resubmitted May 28, 2010

Filed July 12, 2010

Before: Stephen Reinhardt, John T. Noonan, and
Raymond C. Fisher, Circuit Judges.

Opinion by Judge Reinhardt

10199

## COUNSEL

Daniel J. Broderick, Federal Defender, Ann C. McClintock, Assistant Federal Defender, Sacramento, California, for the petitioner-appellee.

Edmund G. Brown, Jr., Attorney General for the State of California, Dane R. Gillette, Chief Assistant Attorney General, Julie L. Garland, Senior Assistant Attorney General, Jennifer A. Neill, Supervising Deputy Attorney General, Sacramento, California, for the respondents-appellants.

## OPINION

REINHARDT, Circuit Judge:

California state prisoner John H. Pirtle was given a parole date in 1990, but in 1994, the California Board of Prison Terms rescinded his parole. After that, the Board denied Pirtle

parole three other times prior to a denial in 2002.[1] Pirtle filed a petition for a writ of habeas corpus, asserting that the Board's 2002 denial of parole violated his constitutional right to due process. The state courts denied his petition, but the district court granted the writ. The State appeals. We have jurisdiction under 28 U.S.C. §§ 1291 and 2253, and we affirm.

## I.

In 1980, Pirtle was convicted of second-degree murder for killing his wife. He was sentenced to a term of seventeen years to life in prison. Ten years later, after a hearing, the Board determined that Pirtle was "suitable for parole and would not pose an unreasonable risk of danger to society or a threat to public safety if released from prison." The Board found that Pirtle committed the crime "as a result of significant stress in his life," that he showed remorse, and that he accepted responsibility for his actions. It also found that Pirtle had a stable social history prior to his marriage to the victim, had no juvenile or adult convictions for violent offenses, had performed well in his prison job assignments, had matured since his crime, had received positive psychiatric reports, and had developed realistic plans for his parole. The Board set his release date for December 30, 1994.

In March 1994, however, the Board rescinded Pirtle's parole. It found that the previous panel had not given sufficient weight to the gravity of the original offense, the fact that he had been carrying a concealed weapon, or his history of alcohol abuse, crime, and domestic violence. The Board denied Pirtle's parole again in 1995, 1996, 1998, and 2002. Each time, the Board relied on the circumstances of Pirtle's crime, his history of criminal conduct, and his failure to attend

---

[1]On July 1, 2005, the California Board of Parole Hearings replaced the Board of Prison Terms. Cal. Penal Code § 5075(a). The two entities perform the same function, and we use the term "Board" to refer to both.

a substance abuse program. The Board's 2002 denial of parole is the subject of this appeal.

At the 2002 hearing, the Board considered two descriptions of Pirtle's crime. The first was from the 1990 Board report following Pirtle's first parole hearing, at which he was deemed suitable for parole. That report was read into the record at the hearing and was transcribed as follows:

> On March the 8th, 1980 at approximately 1:17 a.m., the Gridley Police Department was notified of the shooting at The Moose Lodge. Upon arrival at the scene, the responding police officers observed the victim, Diane Pirtle, lying on the floor with a gunshot wound to her upper chest area. The victim was transported to the memorial hospital where she was pronounced dead at approximately 1:20 a.m. The prisoner, John Pirtle, arrived at the police department and informed personnel on duty that he had just shot his wife at The Moose Lodge. He then produced a small pistol and placed it on the counter. Pirtle then was taken into custody, and when informed that the victim, his wife, had died, responded by stating, okay. An autopsy performed on the victim revealed that she had died as a result of a single 25 caliber bullet entering her upper chest and penetrating her heart and liver. Witnesses relate that at approximately 10:30 p.m. on March 7, 1980, the defendant — the prisoner had entered The Moose Lodge, approached his wife, slapped her in the face and then left. At approximately 1:00 a.m. on March 8, 1980, the prisoner returned to the Moose Lodge, ordered a drink at the bar and paced around the bar area while the victim and another man danced to the music. When the music stopped, the prisoner walked up to the victim, placed his arms around her and shot her in the chest. The prisoner then exited the building.

(name spelling and reading errors omitted).

Next, the Board read into the record Pirtle's own account of the crime that he gave in 1990. It was transcribed as follows:

> The prisoner relates that on the day prior to the killing, he and his wife discussed their marital problems and decided to give their marriage one more try. The following day his wife came to pick him up at the bar where he was bartending. She told him that she wanted to stay in town and drink and he could go home if he wished. The prisoner stated that he left his wife and proceeded home in order to give money to his children for dinner. He then returned to town, had several drinks and went to The Moose Lodge where he observed his wife with another man. The prisoner indicated that this upset him to the point that he slapped his wife before going uptown to continue drinking. He then went to a nearby town where he continued to drink before returning to Gridley. The prisoner stated that on the way back he was stopped by a police officer who told him to go home, which he did. After sleeping for an hour, the prisoner stated he woke up and found his wife was still not home. He returned to look for her. Not finding her at several bars, he went to The Moose Lodge where he found her dancing with another man. He waited for the music to end before approaching the victim and asked her if she was ready to go home. The prisoner indicated that his wife told him that she was not going to go home with him, but that she was going home with Ron, her dancing partner. The prisoner stated that the next thing he recalled was a loud bang and seeing his wife fall to the floor. He then found himself over the gun and became very confused. He walked out of the bar and drove to the police station. The prisoner indicated his remorse for the killing of

his wife by stating that he cared for her a great deal. He further indicated that he had no predisposition to murder her. He states that he had a habit of carrying a loaded weapon with him most of the time for protection. He had been drinking prior to this shooting but does not feel that he was inebriated at the time of the shooting. The prisoner gave no explanation or motive for his action other than his wife rebuffing him for someone else.

In addition to the circumstances of the commitment offense, the Board considered Pirtle's prior criminal history. He had no juvenile arrest record,[2] and as an adult he had misdemeanor convictions for drunk driving, disturbing the peace, disorderly conduct, and escape from the county honor farm. He also had a felony drunk driving conviction.

The Board also discussed Pirtle's tumultuous marriage to the victim. Both Pirtle and the victim were alcoholics and they fought frequently. On at least six occasions, the police were called to break up drunken fights between the Pirtles.

Finally, the Board questioned Pirtle about his history of alcohol abuse. Pirtle was asked why he stopped attending Alcoholics Anonymous ("AA") meetings in prison. He told them that attendance at AA meetings was a condition of his original parole date, but when his date was revoked, he stopped attending because he does not believe in a higher power, which is an important aspect of AA. At a 1996 hearing, the Board asked him why he did not attend AA meetings and he replied, "if you don't believe in a higher power you cannot do the 12 steps, and I don't believe in a higher power." The 2002 panel was aware of Pirtle's reasons for not attending AA.

---

[2]Although the Board stated that Pirtle had no juvenile arrest record, he reported to the Board that when he was fourteen years old, he spent seven days in juvenile hall after being accused of forging a check on his uncle's bank account. He was then put on probation. ER 24.

At the conclusion of the 2002 hearing, the Board found that Pirtle was "not suitable for parole and would pose an unreasonable risk of danger to society or a threat to public safety if released from prison." It found that his crime was committed in "an especially cruel and callous manner," and that it was "carried out in a dispassionate calculated manner." Additionally, the Board found that "[t]he motive for the crime was inexplicable or very trivial in relationship to the offense."

The Board also found that Pirtle had an "escalating pattern of criminal behavior" and that he had "failed to profit from society's previous attempts to correct his criminality." It noted his unstable social history, including his alcohol abuse and the allegations that he was abusive toward his wife. The Board found that he needed to upgrade vocationally, participate in therapy or a self-help group to learn how to manage anger and stress, and take part in a substance abuse program. The Board emphasized its particular concern that Pirtle had not "made a lifelong commitment to a substance abuse program."

On January 27, 2003, Pirtle filed a petition for a writ of habeas corpus in the Butte County Superior Court, asserting that the Board's denial of parole violated his constitutional right to due process because the decision was not supported by any evidence. The state court issued a *Waltreus* denial of his petition, which is a summary dismissal issued when a petitioner raises claims in a habeas corpus petition that were already decided on direct appeal. *See In re Waltreus*, 397 P.2d 1001, 1005 (Cal. 1965). The *Waltreus* denial was in error, because the question whether the Board denied Pirtle parole in violation of his constitutional right to due process was not and could not have been decided on direct appeal from his original conviction. The California appellate courts issued summary denials of Pirtle's subsequent appeals.

Pirtle then filed a habeas corpus petition in district court. A magistrate judge issued a report and recommended that the

writ be granted because the Board's decision was not supported by any evidence. The district court adopted the magistrate judge's findings and recommendations in full, granted the writ, and ordered the Board to set a parole date for Pirtle within 30 days. The State timely appealed.

## II.

The parties dispute the proper scope of review in this case. The State contends that we must apply the deferential standard set forth in the Antiterrorism and Effective Death Penalty Act ("AEDPA"). Under the relevant portion of AEDPA, federal courts may not grant a writ of habeas corpus on

> any claim that was adjudicated on the merits in State court proceedings unless the adjudication of the claim (1) resulted in a decision that was contrary to, or involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the United States; or (2) resulted in a decision that was based on an unreasonable determination of the facts in light of the evidence presented in the State court proceeding.

28 U.S.C. § 2254(d).

Pirtle argues that AEDPA's deferential standard does not apply to his claim because it was not adjudicated on the merits by a state court. Under the "look through" doctrine, in order to determine whether the state courts ever reached the merits of a federal claim, we must "look through" unexplained state court decisions, such as summary denials, to the last reasoned state court decision. *Ylst v. Nunnemaker*, 501 U.S. 797, 802, 806 (1991); *see also Mendez v. Knowles*, 556 F.3d 757, 767 (9th Cir. 2009). Here, the only reasoned state court decision was a *Waltreus* denial, which has been held by the Supreme Court to be neither a procedural denial nor a denial on the merits. *Ylst*, 501 U.S. at 805-06; *see also Hill v.*

*Roe*, 321 F.3d 787, 789 (9th Cir. 2003). Because the state courts did not reach the merits of Pirtle's federal claim, "there is no state court decision on this issue to which to accord [AEDPA] deference." *Pirtle v. Morgan*, 313 F.3d 1160, 1167 (9th Cir. 2002). Where, as here, "it is clear that a state court has not reached the merits of a properly raised issue, we must review it de novo." *Id.*

### III.

**[1]** "California's parole scheme gives rise to a cognizable liberty interest in release on parole." *McQuillon v. Duncan*, 306 F.3d 895, 902 (9th Cir. 2002). That liberty interest encompasses the state-created requirement that a parole decision must be supported by "some evidence" of current dangerousness. *Hayward v. Marshall*, 603 F.3d 546, 562-63 (9th Cir. 2010) (en banc); *see also Pearson v. Muntz*, 606 F.3d 606, 608-09 (9th Cir. 2010).

**[2]** Our "some evidence" analysis is shaped by the state regulatory, statutory, and constitutional law that governs parole suitability determinations in California. *See Hayward*, 603 F.3d at 561-62. California law requires the Board to grant an eligible inmate a parole date unless the Board determines that "consideration of the public safety requires a more lengthy period of incarceration for this individual." Cal. Penal Code § 3041(b). According to the California Supreme Court, "public safety" is the "overriding statutory concern" of the state's parole scheme. *In re Dannenberg*, 104 P.3d 783, 795 (Cal. 2005); *accord In re Lawrence*, 190 P.3d 535 (Cal. 2008); *In re Shaputis*, 190 P.3d 573 (Cal. 2008). The emphasis on public safety is also evident in California's parole regulations, which provide that a prisoner will be found unsuitable for parole if "in the judgment of the panel the prisoner will pose an unreasonable risk of danger to society if released from prison." Cal. Code Regs., tit. 15, § 2402(a). In short, " 'some evidence' of future dangerousness is indeed a state

*sine qua non* for denial of parole in California." *Hayward*, 603 F.3d at 562.

To assist in determining who may pose an unreasonable risk of danger, the California parole regulations identify circumstances that "tend[ ] to indicate unsuitability for release." Cal. Code Regs., tit. 15, § 2402(c). These circumstances include the aggravated nature of the commitment offense, a previous record of violence, an unstable social history, sadistic sexual offenses, a history of severe mental problems related to the offense, and serious misconduct in jail. *Id.* The regulations also identify circumstances that "tend to show suitability" for parole, including the lack of a juvenile record, a stable social history, signs of remorse, significant stress as a motivation for the crime, lack of criminal history, realistic plans for the future, and good institutional behavior. *Id.* § 2402(d).

**[3]** While the regulatory factors are designed to guide the Board's decision, the ultimate question of parole suitability remains whether the inmate poses a threat to public safety. "There must be 'some evidence' of such a threat," *Hayward*, 603 F.3d at 562, and not merely evidence that supports one or more of the Board's subsidiary findings. In particular, the Board may not rely solely on the circumstances of a commitment offense, because "[t]he prisoner's aggravated offense does not establish current dangerousness 'unless the record also establishes that something in the prisoner's pre- or post-incarceration history, or his or her current demeanor and mental state' supports the inference of dangerousness." *Id.* (quoting *Lawrence*, 190 P.3d at 555). Accordingly, under California's parole system and the constitutional requirements of due process, we must determine whether the record contains "some evidence" that Pirtle poses a current threat to public safety.

**[4]** Here, the Board's stated reasons for denying Pirtle parole can be divided into three categories: 1) findings about

the circumstances of the commitment offense; 2) findings about Pirtle's background and history; and 3) findings about Pirtle's conduct while incarcerated. The most substantial of the Board's findings relate to Pirtle's crime. First, the Board found that the offense was carried out in an "especially cruel" manner and demonstrated "an exceptionally callous disregard for human suffering." All of the evidence in the record, however, actually supports the opposite conclusion. As the district court correctly determined, Pirtle did not torment or terrorize his wife on the night of the crime. Although he slapped her early in the evening, she continued to drink and dance at the bar, clearly not traumatized by the experience. Moreover, the record contains no evidence regarding particular suffering as a result of the gunshot wound. The Board identified no characteristic of the shooting that, on a comparative basis, made the action "especially cruel" or "exceptionally callous."

[5] Next, the Board found that the offense was committed in a "dispassionate calculated manner." This finding appears to be based on the Board's speculation that, after Pirtle's confrontation with his wife earlier in the evening, "he retrieved a weapon" from his home. Presumably, this suggested to the Board that Pirtle returned to the bar with the "dispassionate" and "calculated" intention or at least consideration of killing his wife. No evidence in the record supports the Board's conjecture. To the contrary, Pirtle testified at the hearing that he often carried a gun so as to have it available for self-protection while performing his job as a bartender. At the 1994 parole hearing, the transcript of which the panel reviewed before the hearing, he testified that on the night of the murder, he had the gun with him the whole time, including during the first confrontation when he slapped his wife at the bar. According to Pirtle, he decided to return to the bar only after he woke to find that his wife was not home yet. The event that triggered the murder was when he asked her if she was ready to go home and she told him that she was going home with another man, her dance partner.[3] He shot her

---

[3]The State agrees that Pirtle shot his wife only after she told him that she was going home with another man. Indeed, the State asserts that the facts of the commitment offense are "undisputed."

immediately following that public humiliation. Nothing in this account — or anywhere else in the record — suggests that Pirtle spent time coolly planning the crime in advance. Thus, no evidence in the record supports the Board's finding that the offense was dispassionate and calculated.

**[6]** The Board also found that the motive for the crime was inexplicable or very trivial in relationship to the offense. Nothing in the record supports this characterization either. Pirtle shot his wife in a highly-charged, emotional moment. The day after the couple agreed to try to save their failing marriage, Pirtle watched his intoxicated wife dance with another man at a bar. When Pirtle tried to take her home, she refused and instead declared that she was going home with the other man. This public moment of rejection, betrayal, and infidelity created a motive that was hardly trivial or inexplicable. To hold otherwise would be to disregard the history of human nature. No motive is more frequently recorded in literature and in song than jealousy and betrayal.[4] A wife who tells her husband that she is "going home" with another man provides that traditional motive, even if the act of infidelity is not yet consummated, but only clearly contemplated. Accordingly, as with the Board's other findings with regard to the crime, no evidence in the record supports the finding that Pirtle committed the offense for trivial or inexplicable reasons.

---

[4]In some instances the motive has a basis in truth:

> Frankie and Johnny were lovers . . . .
> She shot her man, 'cause he done her wrong.

In other instances, however, it does not, such as in Othello's murder of Desdemona after being deceived into believing her unfaithful:

> Yet I'll not shed her blood;
> Nor scar that whiter skin of hers than snow,
> And smooth as monumental alabaster.
> Yet she must die, else she'll betray more men.
> Put out the light, and then put out the light . . . .

William Shakespeare, Othello act 5, sc. 2.

**[7]** The Board's next set of findings had to do with Pirtle's background. The Board found that Pirtle had demonstrated an "escalating pattern of criminal behavior" and "failed to profit from society's previous attempts to correct his criminality." The district court correctly found that Pirtle's handful of minor misdemeanors and one felony drunk driving offense can hardly be described as an "escalating pattern of criminal behavior." Similarly, no evidence supports the Board's finding that Pirtle failed to profit from society's previous attempts to rehabilitate him. First, although the Board stated that Pirtle "failed previous grants of probation," the record contains no evidence of any such failure.[5] Moreover, although he served two brief jail terms for non-violent, alcohol-related offenses before he committed the murder, this does not serve as evidence that Pirtle "cannot be counted on to avoid criminality," as the Board asserted. To hold otherwise would be to create a per se rule that any inmate who previously spent time in jail for any crime, no matter how minor, "cannot be counted on to avoid criminality" and is therefore unsuitable for parole. Such a rule would actually violate the parole regulations, which consider a lack of "any significant history of violent crime" to be an indicator of *suitability* for parole. Cal. Code Regs., tit. 15, § 2402(d)(6).

**[8]** The Board next found that Pirtle had an unstable social history based principally on alcohol, and additionally on an "escalating pattern of domestic encounters" in his relationship with the victim. A tumultuous relationship with a wife who engaged in multiple extra-marital affairs does not support a finding of an unstable social history, much less does it provide "some evidence" that, thirty years later, Pirtle poses a

---

[5]Indeed, there is no evidence that Pirtle was ever put on probation as an adult. The only evidence in the record with regard to probation of any kind comes from Pirtle's own account of an incident that occurred when he was fourteen years old. According to Pirtle, he was accused of forging a check on his uncle's bank account, and as a result he was placed in juvenile hall for seven days and then put on probation. The record contains no evidence that he failed to complete juvenile probation successfully.

danger to public safety. The transcript of the 2002 parole hearing makes clear, however, that the Board found Pirtle's history of alcoholism to be the most troubling aspect of the record before it and the principal basis of its conclusion regarding an unstable social history. Pirtle's episodic abuse of alcohol played a significant role in his prior convictions as well as in the commitment offense. Recognizing the relationship between Pirtle's prior alcohol abuse and his commitment offense, the Board has repeatedly advised Pirtle that he should attend AA meetings. Pirtle regularly attended such meetings for four years after he was given a parole date in 1990, because doing so was a condition of that original order, but he stopped when the parole date was revoked. Pirtle has explained to the Board that he is an atheist, and as such, he objects to AA's religious content and its emphasis on a higher power.[6] He has also explained to the Board that he is willing to attend a secular substance abuse program, and at his 2002 hearing, he provided the Board with a list of such programs in the area of Northern California in which he could participate if he were released. Pirtle had been unable to attend secular substance abuse programs in prison, however, because according to his uncontroverted testimony, no such programs were available.[7] His failure to attend a program that is not

---

[6]We note that, although the issue is not before us, it would likely violate Pirtle's First Amendment rights to require him to attend AA as a condition of parole. *See Inouye v. Kemna*, 504 F.3d 705, 712-715 (9th Cir. 2007) (holding that requiring a parolee to attend AA or Narcotics Anonymous violates the First Amendment). The California Department of Corrections is, of course, free to impose other parole conditions relating to alcohol, the substance of which we do not presume to consider here.

[7]At his 1996 hearing, the Board informed Pirtle that there was a new secular alternative program to AA at the prison. Two years later, Pirtle testified that he signed up for that program, but he was subsequently transferred to a new facility that did not offer the secular program.

At oral argument, the State contended that Pirtle could have attended self-help programs or engaged in self-study. The record shows that he did attend two self-help programs — Breaking Barriers and Alternatives to Violence. Moreover, the record contains no evidence that self-study was

available has no probative value, and thus cannot support the Board's decision in any way.

**[9]** Notwithstanding his unwillingness to attend AA because of his religious beliefs, Pirtle has been consistently forthright with the Board about his alcohol abuse. He has repeatedly expressed his commitment to abstain from alcohol, both to the Board and to prison psychologists. Pirtle's psychological assessments report that he has a *history* of episodic alcohol abuse, and that it is now in remission. The assessments also state that Pirtle has a great deal of insight about his problem with alcohol and its role in his crimes, and they note that he is committed to sobriety.

**[10]** Pirtle's attitude about alcohol was demonstrated most colorfully at one parole hearing in which he stated: "I mean I wouldn't stick my hand in a jar of rattlesnakes — drinking would be paramount to the same thing." Consistent with the self-awareness that he has demonstrated and that his psychologists have observed, Pirtle had not consumed any alcohol during the twenty-two years of incarceration that preceded his 2002 parole hearing. Because there is no evidence that Pirtle will be unable or unwilling to manage his alcohol problem effectively upon release, as he has already done for more than two decades, we agree with the district court that "the record does not support the panel's determination that petitioner's abuse of alcohol up to 1980 rendered him dangerous in 2002."

---

available to Pirtle as a treatment for substance abuse, or that self-study was suggested by any of the psychologists who regularly assessed Pirtle and recommended that he attend secular AA programs upon release. We can only speculate about the nature of the self-study program to which the State referred at oral argument, and speculation does not, of course, constitute evidence. What *does* constitute evidence is Pirtle's abstention from alcohol throughout the twenty-two years prior to his parole hearing, as well as his impeccable disciplinary record in prison, both of which are highly probative of his attitude towards alcohol and his capacity for self-discipline.

**[11]** The Board's remaining two reasons for denying parole concern Pirtle's rehabilitation program. First, the Board found that Pirtle "failed to upgrade vocationally." It is true that he had not recently completed any vocational training programs at the time of the 2002 hearing, but as the district court noted, he "maintained steady employment while in the institution, building an employment record characterized as 'exceptional.' " Additionally, the record demonstrates that Pirtle already possessed several job skills, including that of farm equipment operator, mechanic, and welder, and that he had an offer of employment upon release doing ranch work for sixty hours per week.[8] In light of his existing vocational skills and post-release employment offer, there is no logical connection between Pirtle's failure to take vocational classes in prison and the conclusion that he would pose a threat to public safety upon release. Accordingly, the Board's finding that Pirtle failed to upgrade vocationally does not constitute evidence of current dangerousness.

**[12]** Finally, the Board found that Pirtle requires additional therapy or self-help in order to learn how to cope with anger and stress.[9] There is no evidence, however, that as of 2002 Pirtle had a difficult time coping with either anger or stress. During his twenty-two years of incarceration, he received no serious disciplinary infractions, which demonstrates that he knows how to "cope with stress in a non-destructive manner." His most recent psychological evaluation notes that "[w]hile admitting that he feels helpless from time to time, he remains cooperative with prisoner programming and continues his impeccable record with no [serious disciplinary violations] at any time." Far from suggesting that Pirtle requires additional therapy in order to become non-dangerous, his psychological

---

[8]We note that the parole regulations list "realistic plans for release" as a factor that demonstrates *suitability* for parole. Cal. Code Regs. tit. 15, § 2402(d)(8).

[9]Oddly enough, in the same paragraph, the Board commended Pirtle for completing an Alternatives to Violence program and acknowledged that his psychiatric report was positive.

reports are consistently positive. In fact, when the Board first recommended that Pirtle seek psychotherapy in 1995, he consulted a psychologist who reported that

> Mr. Pirtle has not and does not manifest any characteristic of psychiatric concern. Having evaluated him myself, as well as having observed him at his place of work for three or more years, I am in accord with the past unanimity of clinical opinion. To involve this man in any type of psychotherapy . . . is a needless and profligate waste of professional effort more wisely extended to emotionally unstable prisoners, or to those who pose a likely danger to society. Mr. Pirtle is neither unstable [n]or potentially dangerous.

The record contains no evidence that contradicts this professional assessment, or that otherwise supports the Board's finding that Pirtle needs additional programming in order to learn how to cope with anger and stress.

[13] In sum, there is no evidence in the record to support the Board's finding that Pirtle poses a *current* threat to public safety. The Board's stated reasons for the denial of parole either lacked evidentiary support, had no rational relationship to Pirtle's current dangerousness, or both. Accordingly, we affirm the district court's decision to grant the writ of habeas corpus.

IV.

Upon granting the writ, the district court ordered the Board to set a parole date for Pirtle within thirty days. The State argues that the district court's remedy was improper, and that the appropriate remedy would be to remand the case to the Board with instructions to hold another hearing. There is no merit to this argument. Federal courts have the latitude to resolve a habeas corpus petition "as law and justice require." 28 U.S.C. § 2243. Ordering the release of a prisoner is well

within the range of remedies available to federal habeas courts. "Habeas lies to enforce the right of personal liberty; when that right is denied and a person confined, the federal court has the power to release him." *Fay v. Noia*, 372 U.S. 391, 430-31 (1963), *overruled on other grounds by Wainwright v. Sykes*, 433 U.S. 72 (1977). Accordingly, we hold that the district court's remedy was proper.[10] Moreover, given the extraordinary passage of time since the district court's order, it may wish to order the Board not simply to set the parole date within thirty days but to set a date for parole that would ensure Pirtle's release on parole within thirty days.

## V.

[14] For the foregoing reasons, we hold that the Board's decision to deny Pirtle parole was not supported by "some evidence" of current dangerousness and thus violated his right to due process. We further hold that the district court's remedy of ordering the Board to set a parole date within thirty days was proper. We therefore affirm the decision of the district court.

**AFFIRMED.**

---

[10]By the same token, the Governor's power to review parole decisions under California Penal Code § 3041.1 does not compel a delay in setting Pirtle's release date. Because the scope of the Governor's review is limited to the materials presented to the Board, our finding that the Board's decision was not supported by "some evidence" would render "a remand to the Governor in this case . . . an idle act." *In re Smith*, 109 Cal. App. 4th 489, 507 (2003); *see also McQuillion v. Duncan*, 342 F.3d 1012, 1015-16 (9th Cir. 2003).