Filed 3/28/13  In re Gray CA6

**NOT TO BE PUBLISHED IN OFFICIAL REPORTS**

California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

SIXTH APPELLATE DISTRICT

| | |
|---|---|
| In re WILLIAM GRAY,<br><br>on Habeas Corpus. | H037493<br>(Santa Clara County<br>Super. Ct. No. 103330) |

In June 1985, William Gray shot his girlfriend, Michelle Martino, multiple times at a barbecue they were hosting in their backyard.  He was convicted by a jury of second degree murder with a firearm enhancement and sentenced to 15 years to life in prison.

In July 2009, the Board of Parole Hearings (Board) found Gray unsuitable for parole.  By order dated August 6, 2010, the Santa Clara County Superior Court granted Gray's petition for a writ of habeas corpus, directing the Board to conduct a new suitability hearing.  The superior court found there was no evidence that Gray lacked insight into the commitment offense and there was no evidence Gray lacked a relapse prevention program.  There was no appeal from the superior court's order and, on November 18, 2010, the Board held a further hearing as directed by the superior court, this time finding Gray suitable for parole.

On April 15, 2011, the Governor reversed the Board's decision.  Gray's subsequent petition for writ of habeas corpus was granted by the superior court on the ground that "[t]he Governor's decision has not stated any facts which were not already rejected by this Court's order reversing the Board's initial [i.e., July 2009] parole denial."

Respondent Rick Hill, warden of Folsom State Prison (Warden), appeals from the order.  He argues that there is some evidence in the record to support the Governor's conclusion that Gray poses a current risk of danger to society.

We agree and shall reverse.

## I.    FACTUAL AND PROCEDURAL BACKGROUND

### A.    *The life crime*

The probation report summarized the commitment offense as follows:

"On June 29, 1985, at approximately 8:00 p.m., the defendant shot and killed his girlfriend, Michelle 'Mickie' Martino and seriously wounded his 13-year-old son, Matthew Gray, as well as close friends Shawna Shannon and Clifford Sartor. The shooting occurred at the Gray-Martino property at 5783 Sierra Road, San Jose, where the defendant and the victim resided.

"The defendant and his neighbor, Clifford Sartor, had worked through the day, and the families, with the defendant's son and Shawna Shannon and her fiancé Ara Call, planned a barbecue dinner that evening. Beer and margaritas were served through the day, and as everyone gathered for the evening, an argument between the defendant and victim Martino occurred over whether or not 13-year-old Matthew Gray should be allowed to drive Ms. Martino's father's jeep to go target shooting. Ms. Martino refused permission, and the argument escalated to a mutually physical confrontation. The defendant pushed Ms. Martino and she bit him. Shortly thereafter, she told him to pack his bags and leave. He then left the group outside and went into the house.

"The barbecue dinner outside proceeded without the defendant. [¶] Towards the end of the meal, Ms. Martino went back into the house with Suzanne Sartor following behind. Suzanne Sartor later reported that she then heard the shattering of the sliding glass door and seeing the victim coming out of the house with a terrified look on her face and the defendant behind her with a rifle. Mrs. Sartor saw the defendant shoot Ms. Martino and saw Ms. Martino fall face forward down the stairs. The defendant then stood over the fallen victim, aimed his rifle again at her, and shot two or three more times. At that point, others had heard the shots and all fled for their safety. The defendant continued to shoot what was later determined to be an AR-15 Semi-Automatic

2

Rifle with .223 Caliber, soft point ammunition. Shawna Shannon was shot on her left side, Matthew Gray was shot in the center of his back, just left of his spine, and Clifford Sartor was grazed on the right eyebrow.

"During the melee, Clifford Sartor called out to the defendant to stop, whereupon the defendant took the rifle, got into his jeep, and drove away.

"Not knowing what next to expect and still fearing for their lives, Clifford Sartor and Ara Call went into the house to arm themselves with other guns. Clifford Sartor went through the house looking for Mickie Martino and found her dead on the outside steps. Attention was then given to those injured, and it was decided that because of the distance and isolation of the property, the victims would be driven [*sic*] the nearest hospital. They arrived at Alexian Brother's Hospital whereupon Matthew Gray and Shawna Shannon were immediately taken into surgery and law enforcement personnel were called.

"At approximately 9:30 p.m., the defendant surrendered himself to the Sheriff's Office telling them that he had 'just killed a bunch of people.' He was then advised of his rights and volunteered no further information without an attorney. A blood sample was drawn shortly after midnight and was later analyzed to contain .12% blood alcohol. The weapon used in the shooting was confiscated from the defendant's jeep.

"Subsequent questioning of the witnesses revealed that all had been aware of the argument between the defendant and Mickie Martino and all had identified the defendant as the responsible person in the shooting. Clifford Sartor further advised officers that shortly before dinner, he had gone into the house to talk to the defendant and calm him down. During this conversation, the defendant threatened to shoot Mickie."

*B.      Habeas Corpus and Board proceedings in 2009 and 2010*

Following the Board's denial of parole in July 2009, Gray filed a petition for writ of habeas corpus challenging the Board's decision. The Santa Clara County Superior Court granted the petition and vacated the Board's decision, finding there was no

3

evidence that Gray lacked insight into the commitment offense and there was no evidence that Gray lacked a relapse prevention program. The superior court also found that the Board could not rely on a 2008 psychological evaluation as a basis for denying parole because a 2009 psychological evaluation "disagreed with the 2008 evaluation." The superior court directed the Board to conduct a new parole suitability hearing within 120 days.

On November 17, 2010, the Board conducted a subsequent parole hearing in compliance with the superior court's order. The 2009 evaluation, prepared by Dr. Melvin Macomber, a forensic psychologist retained by Gray, was presented to the Board at this hearing. The Board ultimately found Gray suitable for parole, stating that Gray "ha[s] insight into the causative factors of the commitment offense, and that [he] ha[s] dealt with those." The Board acknowledged circumstances which would tend to show unsuitability for parole, such as Gray's prior criminality, unstable social history, alcoholism and misconduct while incarcerated. However, the Board noted that Gray had accepted responsibility for his actions and expressed remorse from an early stage, and it felt his remorse was genuine. On balance, the Board felt that Gray's work history, his positive psychological evaluations and his realistic parole plans, combined with his insight into the factors behind the commitment offense, were sufficient to establish his suitability for parole.

C. *Governor's decision*

The Governor reversed the Board. After acknowledging that Gray had taken positive steps while incarcerated and had received positive job performance ratings, the Governor noted these steps were "fairly minor considering the circumstances of the commitment offense, as well as other factors, which indicate that Mr. Gray remains dangerous."

4

In discussing the commitment offense, the Governor indicated Gray shot multiple loved-ones for exceedingly trivial reasons, then fled, leaving his girlfriend dead and the other victims, including his son, wounded.

The Governor then outlined the bases for his decision to reverse the Board. "Mr. Gray identified rage and alcohol abuse as the factors that caused him to commit the crime. But his efforts to address those issues through self-help programs have been extremely limited. In 2005, the Board implored him to participate in substance abuse and anger management self-help programs. He has stubbornly refused to do any self-help, telling the Board in 2010 'I've done those before. . . . And I feel comfortable those don't plague me anymore.' A Board psychologist disagreed, stating in Mr. Gray's 2008 psychological evaluation that his refusal to participate in a substance abuse program increases his risk of violence in the community and noting that the [*sic*] Mr. Gray 'does not recognize that these programs [Alcoholic Anonymous and Narcotics Anonymous] should be a lifetime commitment.' Mr. Gray's inadequate efforts to address his alcohol and anger problems and his resistance towards treatment create great concern that he is still capable of horrific violence. [¶] Further, Mr. Gray's 2008 psychological evaluation contains alarming information. The psychologist noted that Mr. Gray presented as glib and showed a lack of remorse for his crime. The psychologist noted that Mr. Gray smiled as he discussed the crime. When asked why he was smiling, he responded, '[b]ecause I feel ridiculous.' The psychologist noted that Mr. Gray's 'affect did not seem appropriate to the discussion of the crime or to any embarrassment.' Mr. Gray's demeanor left an impression on the psychologist who noted that in all his years of evaluating inmates he had never observed an inmate smiling when describing his crime. The psychologist concluded that Mr. Gray's attitude toward the crime increased his risk factor for violence in the free community. [¶] In sum, Mr. Gray's inability or unwillingness to convincingly explain what led to his shooting spree that caused death and so much suffering indicates to me that he remains dangerous."

5

*D.    October 13, 2011 order granting Gray's habeas corpus petition*

The superior court granted Gray's petition for writ of habeas corpus finding the "Governor's decision has not stated any facts which were not already rejected by this Court's order reversing the Board's initial parole denial."

Warden appealed and subsequently petitioned for a writ of supersedeas staying the superior court's order. We granted the petition.

## II.    DISCUSSION

*A.    Warden is not estopped from appealing reversal of the Governor's decision*

In its August 2010 order, the trial court found that the Board's 2009 conclusions that Gray lacked insight into the commitment offense and lacked a relapse prevention plan were not supported by the evidence. Gray notes that the Board did not appeal, but instead held a subsequent hearing in compliance with the trial court's order. As a result, Gray argues, the Governor was also bound by the trial court's findings and was precluded from relying on any factors that were rejected by the trial court in its 2010 order. We disagree.

Article V, section 8, subdivision (b) of the California Constitution provides in full: "No decision of the parole authority of this state with respect to the granting, denial, revocation, or suspension of parole of a person sentenced to an indeterminate term upon conviction of murder shall become effective for a period of 30 days, during which the Governor may review the decision subject to procedures provided by statute. The Governor may only affirm, modify, or reverse the decision of the parole authority on the basis of the same factors which the parole authority is required to consider. The Governor shall report to the Legislature each parole decision affirmed, modified, or reversed, stating the pertinent facts and reasons for the action."

The statutory procedures governing the Governor's review of a parole decision pursuant to article V, section 8, subdivision (b), of the California Constitution are set forth in Penal Code section 3041.2, which states: "(a) During the 30 days following the

6

granting, denial, revocation, or suspension by a parole authority of the parole of a person sentenced to an indeterminate prison term based upon a conviction of murder, the Governor, when reviewing the authority's decision pursuant to subdivision (b) of Section 8 of Article V of the Constitution, shall review materials provided by the parole authority. [¶] (b) If the Governor decides to reverse or modify a parole decision of a parole authority pursuant to subdivision (b) of Section 8 of Article V of the Constitution, he or she shall send a written statement to the inmate specifying the reasons for his or her decision." (*In re Shaputis* (2008) 44 Cal.4th 1241, 1257, fn. 17.)

"The Governor is subject to the same standards as those that apply to the Board. As we stated in [*In re*] *Rosenkrantz* [(2002)] 29 Cal.4th 616, the Governor's interpretation of a documentary record is entitled to deference. [Citation.] Although 'the Governor's decision must be based upon the same factors that restrict the Board in rendering its parole decision' [citation], the Governor undertakes an independent, de novo review of the inmate's suitability for parole. [Citation.] Accordingly, the Governor has discretion to be 'more stringent or cautious' in determining whether a defendant poses an unreasonable risk to public safety. [Citation.] When a court reviews the record for some evidence supporting the Governor's conclusion that a petitioner currently poses an unreasonable risk to public safety, it will affirm the Governor's interpretation of the evidence so long as that interpretation is reasonable and reflects due consideration of all relevant statutory factors." (*In re Shaputis*, *supra*, 44 Cal.4th at p. 1258.)

"The collateral estoppel doctrine precludes a party from relitigating issues decided in a prior proceeding only to the extent certain threshold requirements are satisfied. [Citation.] ' "First, the issue sought to be precluded from relitigation must be identical to that decided in a former proceeding. Second, this issue must have been actually litigated in the former proceeding. Third, it must have been necessarily decided in the former proceeding. Fourth, the decision in the former proceeding must be final and on the merits. Finally, the party against whom preclusion is sought must be the same as, or in

privity with, the party to the former proceeding." ' " (*Turner v. Superior Court* (2003) 105 Cal.App.4th 1046, 1058.)

Collateral estoppel does not apply in this case. A petition for writ of habeas corpus challenging a parole decision by the Board and a subsequent petition challenging a decision by the Governor "constitute separate cases." (*In re Rosenkrantz*, *supra*, 29 Cal.4th at p. 669.) "[T]he determination whether some evidence supported the particular findings forming the basis for the Governor's decision *is not the same* as the determination whether some evidence supported the factual basis for the Board's decisions." (*Id*. at p. 670, italics added.) In addition, the Governor and the Board "are not the same party in the context presented[, and the superior court's conclusion] there was no evidence supporting the Board's finding of parole unsuitability could not bind the Governor, who is constitutionally authorized to render an independent decision regarding that ultimate question." (*Ibid*.)

Where the Board has, as in this case, found an inmate suitable for parole, the Governor is entitled to undertake an "independent, de novo review" (*In re Rosenkrantz*, *supra*, 29 Cal.4th at p. 660) of that determination. That review is based on "the entire record, including the facts of the offense, the inmate's progress during incarceration, and the insight he or she has achieved into past behavior." (*In re Shaputis* (2011) 53 Cal.4th 192, 221.) Although the trial court found that the facts in the record at the time of the 2009 hearing did not provide some evidence to support a finding of suitability, the Governor was allowed to consider those facts when reviewing the Board's decision in Gray's subsequent parole hearing. Therefore, collateral estoppel did not preclude the Governor from relying on evidence relating to Gray's insight and relapse prevention plan in his review.

B. *There is some evidence to support the Governor's decision*

In reversing the Board's decision granting parole, the Governor cited the following factors as demonstrating that Gray posed an unreasonable risk to public safety:[1] (1) the facts of the commitment offense; (2) the lack of self-help; and (3) Gray's 2008 psychological evaluation.

There is some evidence in the record to support the factors relied on by the Governor. The commitment offense occurred because Gray got into an argument with Martino over whether Gray's 13-year-old son should be allowed to drive a family member's jeep to go target shooting. Gray admitted to drinking heavily that day, felt that Martino had embarrassed him, and his anger at her "turned to rage, when, according to him, [Martino] re-entered the house and said 'some things.' " Gray's rage led him to not just shoot Martino multiple times, but led him to fire multiple shots at the other people who were present that evening, wounding several of them, including his son. The Governor's conclusion that Gray "shot multiple loved ones for exceedingly trivial reasons" is borne out by the record in this case.

The unchanging circumstances of an inmate's commitment offense, horrifying as they may be, would usually not be sufficient to support a finding that the inmate presents a current and unreasonable risk of danger to public safety. (*In re Lawrence* (2008) 44 Cal.4th 1181, 1214.) In reaching this conclusion, the Governor, like the Board, "must consider all relevant statutory factors, including those that relate to postconviction

---

[1] Gray contends that the Governor's decision is fatally flawed because it stated only that Gray "currently poses *a* danger to society if released from prison" rather than stating that he posed "an unreasonable risk of danger" to public safety as required by 15 California Code of Regulations sections 2401 and 2402(a). We decline to give talismanic effect to the language set forth in the regulations, and we presume that the Governor was aware of the proper metric for gauging an inmate's suitability for parole as set forth in the regulations and applicable legal authority. The outcome of our review depends on whether the Governor's decision meets that standard, not the phraseology utilized in that decision.

9

conduct and rehabilitation." (*Id*. at p. 1219.) The Governor did so here, and concluded that these postconviction factors, considered in conjunction with the circumstances of the commitment offense, demonstrated that Gray posed an unreasonable risk to public safety.

In the probation report, Gray admitted to a long history of alcoholism with periodic failed attempts at sobriety. Given these failures, he decided he would not quit drinking but would instead "accept his alcoholism." After being released on bail pending trial, however, Gray joined AA and "participated in extensive psychotherapy." He continued with AA while incarcerated, but only until 1995, contrary to recommendations from psychologists and previous Boards that the program involves a lifetime commitment. Despite acknowledging that rage and alcohol abuse were the principal factors behind the commitment offense, Gray stopped participating in self-help programs concentrating on substance abuse and anger management. Although the Board suggested as far back as 2005 that Gray engage in such programs again, he refused to do so, telling the Board at his 2010 hearing: "I've done those before. . . . And I feel comfortable those [i.e., anger management and substance abuse issues] don't plague me anymore." The 2008 psychological evaluation opined that Gray's refusal to participate in substance abuse programming makes him an increased risk of danger to the community.

It is true Gray has apparently managed to avoid using drugs or alcohol while incarcerated, without the assistance of institutional substance abuse programs. However, according to Dr. Macomber, Gray reported that, once he is released, he intends to "become involved, once again, in [AA] programs[,] . . . getting a sponsor . . . [and] becom[ing] a sponsor." If Gray is no longer "plague[d]" by substance abuse issues and thus has no need for institutional substance abuse programs, why does he feel the need to resume his participation in AA upon release? Dr. Macomber, who shares Gray's opinion that he has already "achieved maximum benefit" from prison self-help, failed to explore this seemingly contradictory stance.

10

In any event, the Governor is not bound by Gray's personal assessment that he is no longer plagued by anger management and substance abuse issues. Nor is the Governor bound by the 2009 psychological evaluation prepared by Dr. Melvin Macomber, who opined that Gray's "scientific efforts" in the field of physics "are far more beneficial to him . . . than his continuing to participate in prison self-help programs in which he has already achieved maximum benefit." The Governor is entitled to rely on the concerns raised by Gray's 2008 psychological evaluation and determine that his ongoing failure to participate in self-help makes him unsuitable for parole.

The 2008 evaluation also noted that Gray, while discussing the life crime, appeared glib and lacking remorse. He even smiled during the discussion and when the psychologist, Dr. Robert Record, asked why he was smiling, Gray explained that he felt "ridiculous." However, Record believed Gray's "affect did not seem appropriate to the discussion of the crime *or to any embarrassment*." (Italics added.) Significantly, Record noted that, "[i]n all of the inmates that I have evaluated over the years I never asked why an inmate was smiling when describing the crime."

According to Dr. Macomber, "[s]hame and embarrassment can be expressed, and often is, by an embarrassed smile," yet Dr. Record "did not acknowledge that obvious fact." Gray told Dr. Macomber that his "smile was more of an embarrassed grimace." As a result, Dr. Macomber rejected Dr. Record's assessment of Gray's attitude toward the crime.

The Governor, however, was under no obligation to similarly reject Dr. Record's assessment. Contrary to Dr. Macomber's accusation that Dr. Record failed to acknowledge that people can express embarrassment by smiling, the 2008 psychological evaluation expressly notes that Gray's affect "did not seem appropriate . . . to any embarrassment." In evaluating an inmate's suitability for parole, the Governor is to consider "the passage of time or the attendant changes in the inmate's psychological or mental attitude." (*Lawrence*, *supra*, 44 Cal.4th at p. 1221.) Since there is some evidence

11

to support the Governor's determination that Gray's attitude toward the life crime reflected a lack of remorse, rather than embarrassment, the conclusion that Gray remains unsuitable for parole was not arbitrary or capricious.

## III. DISPOSITION

The October 13, 2011 order granting Gray's petition for a writ of habeas corpus is reversed. The matter is remanded to the superior court with directions to vacate that order and enter a new order denying Gray's petition for a writ of habeas corpus.

_____
                              Premo, J.


WE CONCUR:



_____
     Rushing, P.J.




_____
     Elia, J.